COCA–COLA BOTTLING COMPANY OF SHREVEPORT, INC., et al., Plaintiffs,

v.

The COCA–COLA COMPANY, a Delaware corporation, Defendant.

ALEXANDRIA COCA–COLA BOTTLING COMPANY, LTD., et al., Plaintiffs,

v.

The COCA–COLA COMPANY, a Delaware corporation, Defendant.

Civ. A. Nos. 83–95 MMS, 83–120 MMS.

United States District Court, D. Delaware.

Aug. 2, 1988.

Edmund N. Carpenter, II, Charles F. Richards, Jr. and Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant and Jane F. Vehko of Bondurant, Mixson & Elmore, Atlanta, Ga., Miles J. Alexander, Jerre B. Swan and William H. Brewster of Kilpatrick & Cody, Atlanta, Ga., of counsel), for plaintiffs.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Frank C. Jones, Michael C. Russ and George S. Branch of King & Spalding, Atlanta, Ga., of counsel), for defendant.

OPINION

MURRAY M. SCHWARTZ, Chief Judge.

There are three related cases now before the Court: *Coca–Cola Bottling Company of Elizabethtown, Inc. v. The Coca–Cola*

*Company,* No. 81–48 MMS; *Coca–Cola Bottling Company of Shreveport, Inc. v. The Coca–Cola Company,* No. 83–95 MMS; and *Alexandria Coca–Cola Bottling Company, Ltd. v. The Coca–Cola Company,* No. 83–120. This opinion disposes of motions filed in the latter two cases (the "diet Coke cases"); an opinion released concurrently with this one (*"Coke VI"*) addresses motions filed in the first case (the "Coke case," or "Elizabethtown"). Specifically, this opinion treats the partial summary judgment motions filed by the Coca–Cola Company (the "Company") and the cross-motions for partial summary judgment filed by the plaintiffs.

The Elizabethtown litigation began in 1981 and stemmed from the Company's decision to begin substituting high-fructose corn syrup ("HFCS" or "HFCS–55") for granulated sugar in the syrup for Coca–Cola sold by the Company to the plaintiff bottlers. The *Coke* case centers primarily around the type of syrup to which the bottlers are entitled (sucrose-sweetened or HFCS-sweetened) and the price of that syrup. In 1983, when the Company introduced its new diet product, diet Coke, many Coca–Cola bottlers believed that the Company was obligated to supply the syrup for

the new product under the terms of the existing contracts. The Company disagreed and these suits ensued.

The plaintiffs in 83–95 (the "unamended bottlers") are bottlers whose contracts derive from agreements entered as consent decrees (the "Consent Decrees") primarily between the ancestors of the present bottlers (the "parent bottlers") and the Company in 1921.[1] The plaintiffs in 83–120 (the "amended bottlers") are bottlers who have amended their contracts with the Company in response to a Company proposal and negotiations begun in 1978 (the "1978 amendment"). The differences in status of the unamended and amended bottlers will be discussed more fully below.

Trial of the three cases is scheduled to begin in late September of this year and continue for five months.

This Court has jurisdiction over the diet Coke cases pursuant to 28 U.S.C. §§ 1332, 1338, 2201 (1982 & Supp. IV 1986); and 15 U.S.C. §§ 15, 26, 1121 (1982).

## I.  FACTUAL BACKGROUND

Many of those familiar with this litigation know the following litany by heart.[2]

*Coca–Cola Bottling Co. of Shreveport v. The Coca–Cola Co., Alexandria Coca–Cola Co. v. The Coca–Cola Co.,* 563 F.Supp. 1122 (D.Del. 1983) (denying preliminary injunction)—*(Diet Coke I )*

*Alexandria Coca–Cola Bottling Co. v. The Coca–Cola Co.,* 637 F.Supp. 1220 (D.Del.1984) (denying plaintiffs' summary judgment motion)—*(Diet Coke II )*

*Coca–Cola Bottling Co. of Shreveport v. The Coca–Cola Co. of Alexandria Coca–Cola Bottling Co. v. The Coca–Cola Co.,* 107 F.R.D. 288 (D.Del.1985) (mandating disclosure of secret formulae)—*(Diet Coke III )*

*Coca–Cola Bottling Co. of Shreveport v. The Coca–Cola Bottling Co.,* 110 F.R.D. 363 (D.Del. 1986) (preclusion order)—*(Diet Coke IV )*

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.,* 654 F.Supp. 1388 (D.Del. 1986) (findings of fact and conclusions of law following trial of class issues)—*(Coke III )*

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Bottling Co.,* 654 F.Supp. 1419 (D.Del.1987) (plaintiff's summary judgment motion on standing)—*(Coke IV )*

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.,* 668 F.Supp. 906 (D.Del. 1987) (plaintiffs' motion for preliminary in-

---

1.  Certain of the bottlers intervened in the litigation resulting in the 1921 Consent Decrees. *See Coke IV,* 654 F.Supp. 1419, 1430 (D.Del.1987). The original plaintiffs, however, were the "parents" of the actual bottlers—the companies with which the Coca–Cola Company originally contracted for the establishment of the business of bottling Coca–Cola.

2.  Sources for the following account include: the nine previous published opinions in the three cases; the record on appeal to the Third Circuit following grant of the 1921 plaintiffs' motion for a preliminary injunction, *see The Coca–Cola Bottling Co. v. The Coca–Cola Co.,* 269 F. 796 (D.Del.1920) ("Judge Morris's opinion," or *"Coke 1920"*); and the plaintiff Elizabethtown's brief in support of its motion for class certification in 81–48 (Docket Item, "Dkt.," 60, 81–48).

  For ease of reference, the Court's previous opinions in the three cases will conform to the following format:

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.,* 95 F.R.D. 168 (D.Del.1982) (initial denial of class certification)—*(Coke I )*

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.,* 98 F.R.D. 254 (D.Del.1983) (opinion on reargument granting limited class certification)—*(Coke II )*

For the sake of those less steeped in the history of the parties, the Court will repeat it yet again.[3]

### A. The Growth of the Bottling System

In an amusing sketch of the history of Coca–Cola, Pat Watters notes that by the late 1970's, the world's population consumed approximately 12.5 million gallons of Coca–Cola drinks daily. P. Watters, *Coca–Cola: An Illustrated History* 3 (1978). There is every reason to believe that this figure is considerably greater today. The nativity of this phenomenally successful soft drink is due to the efforts of an Atlanta pharmacist, John Styth Pemberton, who developed the original formula for the drink in 1886. Shortly afterward, Asa G. Candler, also an Atlanta pharmacist and owner of a wholesale drug company, purchased the trademark rights and the formula from Pemberton. Candler formed The Coca–Cola Company to market the product as a soda fountain beverage.

In 1899, two Chattanooga lawyers, B.F. Thomas and J.B. Whitehead, purchased the rights to sell Coca–Cola in "bottles or other receptacles." Docket Item ("Dkt.") 1, exh. B–1 at 39 (83–120). Their agreement with the Company provided that the Company would supply the syrup at a fixed price and that Whitehead and Thomas would in turn produce sufficient quantities of the drink to meet "the demand in all territory embraced in this agreement." *Id.*[4]

The 1899 contract obligated Whitehead and Thomas to "establish in the city of Atlanta, as soon as the necessary machinery and buildings can be obtained, a bottling plant for the purpose of bottling a mixture of Coca–Cola syrup preparation with carbonic acid and water." *Coke 1920,* 269 F. at 800 (quoting 1899 contract). Initially, two plants were built and operated by Whitehead and Thomas. Demand soon outpaced the capacity of the two plants, however, and Whitehead and Thomas determined that new plants were necessary to fulfill their contractual duties. *Id.* at 801.

At about the same time, there was a falling out between Whitehead and Thomas as to the best method of developing the bottling business. In particular, they disagreed over the length of the contracts to be granted to "first-line," or "actual" bottlers—local plant owners with whom Whitehead and Thomas would contract in fulfillment of the obligation imposed by the 1899 contract to supply sufficient quantities of the drink to meet demand. Whitehead favored perpetual contracts, whereas Thomas viewed term contracts as wiser. Unable to compromise, the two split the bottling business. The company they initially had formed, Coca–Cola Bottling Company, remained under the control of Thomas (the "Thomas Co."), who retained bottling rights in approximately fifteen states while conveying rights in the remainder of the states to Whitehead. Whitehead and a new partner, J.T. Lupton, named their bottling company *"The* Coca–Cola Bottling Company" (the "Whitehead–Lupton Co."). The Company, Thomas Co., and Whitehead–Lupton Co. joined in amending the 1899 agreement to reflect the division.

With the consent of the Company, the two bottling companies (the "parent bottlers")[5] proceeded to sub-contract with in-

---

3. junction denied; amendment of complaint to request further relief allowed)—(*Coke V*)
The record on appeal from the 1920 preliminary injunction is reproduced as Plaintiffs' Exhibit 1 ("PX 1") entered into the record of the trial of the certified class issues in 81–48.

3. One more skilled writer put it best: "We do not fear being called meticulous, inclining as we do to the view that only the exhaustive can be truly interesting." T. Mann, *The Magic Mountain,* × (H. Lowe–Porter trans. Vintage ed. 1927).

4. The six New England states, Texas, and Mississippi were not included.

5. Whitehead–Lupton Co. and Thomas Co. formed additional "parent" bottlers, as well as "subparents." These companies (including the "1903 Company," the Western Coca–Cola Bottling Company, Coca–Cola Bottling Works, Coca–Cola Bottling Works 3rd, and Pacific Coca–Cola Bottling Company) received the rights to the bottling business in the territories covered by the 1899 contract from either Whitehead–Lupton or Thomas. In addition, in 1916, the New England Coca–Cola Bottling Company received the rights to bottle Coca–Cola in the New England states, which had not been conveyed in the 1899 contract, directly from the Coca–Cola Company.

dividual first-line bottlers for actual bottling. The first-line bottlers invested in bottling plants and equipment, and bought their syrup from the parent bottler with rights to bottle Coca–Cola in their locality. By 1920, the actual bottlers' capital investment exceeded that of the Company by a factor of five.

For the first years of the contracts, the Company sold the bottlers the same syrup sold to soda fountains. Because there was some disparity in taste between the bottled and the fountain drink, some saccharin was added to the bottled product.[6] After the passage of the Pure Food and Drug Act in 1906, outlawing the use of saccharin in food, the Company formulated a separate bottle syrup. The new syrup contained more granulated sugar to maintain the sweetness, and accordingly was more expensive. The parent bottlers allowed the Company to increase the syrup price to reflect the higher cost of the sweetener.

World War I disrupted (among other things) the sugar market, bringing price controls and rationing. Unable to purchase its requirements of sugar, the Company experimented with sugar substitutes, including corn syrup, in an effort to compensate for the limited amount of sugar available. This experimentation may have been prompted by work done by the United States Department of Agriculture, which released a report titled "Formulas for Sugar–Saving Sirups [sic]." *See* Dkt. 60 (81–48) at 20. The sugar substitutes did not produce syrup of satisfactory quality.

After the war, the situation did not improve. Sugar prices soared due to shortages, and the Company sought new agreements from the bottlers tying syrup prices to its manufacturing costs. While negotiating this proposal, the bottlers demanded specific information from the Company about its costs. The Company refused to disclose the information, insisting that the bottlers' verification concerns be allayed by "the integrity and good faith of The Coca–Cola Company." PX 1, at 1580.

Unwilling to take the Company's representations on faith, the bottlers rejected the flexible pricing proposal. The Company then announced that it viewed the contracts with the parent bottlers as terminable at will, to which the bottlers responded by demanding that the Company acknowledge the perpetual nature of the contracts. The Company informed the bottlers that their contracts would be terminated as of May 1, 1920.

The parent bottlers filed separate suits seeking a determination that their contracts were perpetual. Pending a final determination of the litigations, the parties agreed to a court order temporarily governing their relations. Syrup price per gallon was set at $1.72 for five months, after which the price would be adjusted up or down from that figure, depending on the Company's costs.

Unknown to the bottlers, and contrary to the representations made at the outset of the litigation in an affidavit by Charles H. Candler, then Chairman of the Board of the Company, the Company had entered into long-term sugar contracts just when sugar prices peaked. Thus, while the price of sugar dropped steeply from a June, 1920, peak, and while the prices of competing beverages fell, the price of Coca–Cola remained high. Coca–Cola sales volume decreased dramatically, by 53% in September 1920, and by 50% in October, 1920.

Expecting relief on November 1, when the $1.72 price became adjustable, the bottlers instead were met with price increases, as the Company attempted to recoup its above-market sugar costs. The Company announced further increases in December and January. Announcement of a February price increase prompted several of the bottlers to seek supplemental relief for fraud and the "appointment of a special master to determine the syrup cost under the terms of the Order." *Coke III*, 654 F.Supp. at 1395.

' On November 8, 1920, Judge Morris issued a preliminary injunction essentially adopting the bottlers' contentions. Ulti-

---

**6.** *See Diet Coke II,* 637 F.Supp. at 1228 n. 39.

mately, after argument before the Third Circuit Court of Appeals, but before that court's decision, the parties agreed to contract amendments settling the suits. These amendments, or settlement agreements, were incorporated into consent decrees. In large part, the Consent Decrees and the corresponding amendments to the first-line bottlers' contracts still govern the relations between the Company and the "unamended bottlers." *See Coca–Cola Bottling Company of Elizabethtown, Inc. v. The Coca–Cola Company,* 696 F.Supp. 57, at page 60 (D.Del.1988) (*"Coke VI"*).

The specific provisions of the Consent Decrees are set out in some detail in *Coke VI,* the companion opinion to this one. *See Coke VI,* at pages 64–67. Briefly, the decrees recognized the mutual benefits of vigorously promoting the sale of Coca–Cola, acknowledged the perpetual nature of the contracts between the parents and the Company, devised a quality-control mechanism, and created a pricing scheme tied to the market price of sugar. The provisions most pertinent to the *Diet Coke* cases are paragraphs 8, 9, and 10. These paragraphs describe and apportion rights and duties concerning the trademark, and require that the syrup provided by the Company be "high grade standard Bottlers Coca–Cola syrup," containing "not less than five and thirty-two one hundredths (5.32) pounds of sugar to each gallon." *See* Dkt. 1 (83–95), exh. S (Consent Decrees). They are set forth more fully below.

The Consent Decrees contemplated amendment of the contracts between the parent bottlers and the actual bottlers to conform to the agreements reached between the parents and the Company. Indeed, the Whitehead–Lupton case expressly conditioned the settlement agreements on the consent of the actual bottlers. The actual bottlers agreed to the conforming amendments, and received assignments of certain of the parents' rights under the decrees.

## B. *1921–1980*

The Consent Decrees and stable sugar prices combined to smooth the troubled relations between the bottlers and the Company. With the exception of some isolated disagreements, not until 1963 did another significant squabble occur between the two sides. At that time the Company introduced TAB, a diet soft drink offered to the bottlers on terms separate from the existing contracts, which provoked the Thomas Co. to threaten suit. The Thomas Co. took the position that TAB was a substitute for or a modified version of Coca–Cola. Eventually, the parties incorporated a clause which purported to preserve their rights: "Neither the execution, nor the performance of this contract by either Party hereto, shall affect in any manner either Party's rights, responsibilities or covenants to the other Party...." Dkt. 400 (83–95) at 89 (quoting TAB contract, Dkt. 63 (83–95), exh. N).

Between the entry of the Consent Decrees in 1921 and 1975, the Company gradually acquired all of the parent bottlers and subparent bottlers, assuming the obligations to the actual bottlers. In 1978, the Company began discussing proposed amendments to the pricing formula in the bottlers' contracts. Bottlers, concerned by the additional risks they would assume under the Company's proposal, suggested modifications. After a period of negotiation, the bottlers and the Company settled on a compromise pricing formula. The new formula priced syrup based on a "sugar element," a "base element," and the Consumer Price Index. Additionally, the amendment provided that "in the event the Company modified the formula of Coca–Cola Bottlers Syrup to replace sugar with 'another sweetening ingredient,' the resulting savings would be passed through to amending bottlers." *Coke III,* 654 F.Supp. at 1395.

Many actual bottlers accepted the 1978 amendment, but a substantial group preferred to retain their unamended contracts with the original pricing scheme. The plaintiffs in 83–95 did not accept the 1978 amendment. The plaintiffs in 83–120 did

accept the 1978 amendment.[7]

### C. *1980–1988*

"After years of research and extensive testing," Dkt. 798 (81–48) at 13 (Defendant's Brief in Support of Motion for Partial Summary Judgment), the Company began substituting HFCS for part and eventually all of the sugar used to sweeten Coca–Cola bottle syrup. "HFCS is made 'by hydrolysis of corn starch by chemical enzymes.'" Dkt. 60, at 50. HFCS does not affect the taste of soft drinks in which it is used; HFCS-sweetened Coca–Cola and sucrose-sweetened Coca–Cola are indistinguishable in terms of taste. The Company gradually eliminated all of the sugar in the syrup and utilized HFCS exclusively.

Although substituting HFCS for sugar, the Company continued to price syrup sold to unamenders under the letter of the unamended contracts, i.e., according to the purported "market price" of granulated sugar. The Company, however, passed through the savings from the use of HFCS to the amended bottlers, pursuant to the 1978 amendments provision for use of an alternate sweetener. This prompted some unamended bottlers to file suit in 1981 against the Company for breach of contract and breach of the Consent Decrees.[8]

The Court's opinions in *Diet Coke I,* 563 F.Supp. 1122 (D.Del.1983), and *Diet Coke III,* 107 F.R.D. 288 (D.Del.1985) contain useful descriptions of the Company's product innovations following the switch to HFCS. The first of these innovations, diet Coke, was launched in reaction to the Company's perception that its existing diet product, TAB, "suffered from a relatively narrow market appeal." *Diet Coke I,* 563 F.Supp. at 1127. Because the diet market promised to expand by nearly one hundred percent within the decade, and because a ten percent gain in market share meant retail revenues of an additional $5 billion:

> In 1980, the Company began a two-year market and technical research project aimed at developing the new diet cola. On July 8, 1982, diet Coke was introduced with great fanfare. The name was chosen carefully and focused on the descriptive nature of the word "diet" and the tremendous market recognition of "Coke." Apr. '83 Tr. at 41. The advertising emphasized the taste of the new cola and its relationship to Coke, rather than its low-calorie nature. The advertising campaign has been intense and effective. The Company spent some $50 million in research and marketing, has budgeted $31 million for 1983 advertising, and has expanded approximately $20 million to date. *Id.* at 48. . . .

> The Company sold diet Coke syrup to bottlers at the same price as TAB syrup —$3.02 per gallon during the first quarter of 1983 . . . [T]he price of Coke syrup to amended bottlers was $3.049 per gallon and $2.69 per gallon to the unamended bottlers during the same time period. . . . The bottlers want to benefit from th[e] cost savings [from the use of a cheaper sweetener] while the Company insists the higher profit margin is necessary to cover the large research, development, marketing, and advertising costs relating to diet Coke. All agree that the bottlers sell diet Coke at a profit even without the pass-through of savings; therefore, the dispute centers upon who should receive the incremental profit— the Company or the bottlers.

> The situation is complicated by the manner in which diet Coke was introduced. The bottlers were not consulted before the introduction and no price terms were discussed. Cowart testified that this failure to consult the bottlers occurred because of competitive pressure. Apr. '83 Tr. at 40. The Company's fear of the imminent introduction of Pepsico's caffeine free colas necessitated the accelerated introduction of the Company's new entrant in the cola market. In

---

**7.** As mentioned above, the plaintiffs who have not accepted the 1978 amendment are known as "unamended bottlers," or "unamenders," and the plaintiffs with amended contracts are known as "amended bottlers," or "amenders."

**8.** That suit is 696 F.Supp. 57, the companion case to the ones addressed in this opinion.

fact, these caffeine free colas, Pepsi–Free and Sugar-free Pepsi–Free, were introduced two days before diet Coke. This series of events had several unfortunate effects from the bottler's viewpoint: first, the lavish advertising campaign precipitated immediate demand for a product to which the bottlers did not have immediate access; second, this demand strengthened the negotiating position of the Company and weakened that of the bottlers regarding the marketing terms for diet Coke; and third, the failure to consult resulted in somewhat bruised egos.

Naturally, bottlers began requesting, if not demanding, diet Coke syrup and beverage base. Many [bottlers, both amended and unamended] felt that the Company was obligated to provide diet Coke under the terms of their existing Bottler's Contracts for Coke.... The Company, however, took the position that diet Coke was not within the scope of the existing contracts and a new term contract with flexible pricing would have to be developed.

On October 7, 1982 the Company formally presented a proposed Phase I/Phase II negotiating procedure to the chairman of an Ad Hoc Committee which was followed by a formal presentation to the Board of Governors of The Coca–Cola Bottlers' Association. Phase I of the process constitutes the execution of a Temporary Amendment to the Bottler's Contract which governs the pricing of diet Coke pending a final agreement on a permanent contractual arrangement. Phase II represents negotiations towards the permanent pricing and marketing of diet Coke and other new cola beverages. Phase II negotiations are in progress at this time.

The Temporary Amendment is intended to be a interim measure which permits the sale of diet Coke pending permanent resolution of the Bottler's Contract issues. Approximately 191 first-line bottlers have signed the Temporary Amendment and approximately 181 first-line bottlers, while having not signed, have agreed to the terms of the Temporary Amendment. These 372 first-line bottlers are receiving diet Coke syrup or beverage base and are marketing diet Coke within their exclusive territories. The plaintiffs in this case, who represent approximately 3 percent of the Company's domestic sales of Bottler's Syrup, could have access to diet Coke but have refused to either sign or accept the terms of the Temporary Amendment. Consequently, the Company has refused to provide diet Coke syrup or beverage base to these bottlers unless and until they either sign or accept the terms of the Temporary Amendment. Plaintiffs basically object to one clause of the Temporary Amendment which states:

9. It being the intent and purpose of the Bottler and the Company that this Temporary Amendment shall in no way prejudice or otherwise affect their respective rights and obligations under the Bottler's Contract or from any other source, or their respective legal or equitable claims, the Bottlers and the Company expressly stipulate that this Temporary Amendment shall have no such effect. It is possible that other bottlers may seek through judicial interpretation or otherwise to require the Company to supply Coca–Cola syrup or beverage base for diet Coca–Cola under their existing Bottler's Contacts at the price then in effect for Bottlers' Coca–Cola syrup absent this Temporary Amendment. It is further agreed, however, that during the period this Temporary Amendment is in effect, the price of Coca–Cola syrup and beverage base for diet Coca–Cola as between the parties hereto shall be determined solely under this Temporary Amendment.

*Diet Coke I*, 563 F.Supp. at 1127–29 (footnotes omitted) (quoting Dkt. 1 (83–95), exh. W, ¶ 19 of Temporary Amendment).

The Company derived new Coke, the second innovation following HFCS, from its development research on diet Coke.

[I]n April, 1985, the Company announced that it would stop producing Coca–Cola under the existing formula ("old Coke")

and immediately start producing "new" Coke, which, the Company proclaims, tastes even better than old Coke. According to the promotional materials that accompanied the announcement of new Coke, the formula for new Coke was derived from the research that led to the development of diet Coke. The secret ingredient in new Coke, called "7X–100," is different than the secret ingredient in old Coke, but it is still only known to a handful of individuals and is kept locked in a bank vault in Georgia.

... [I]n response to consumer demand, announced in July, 1985, that it would bring back old Coke under the name "Coca–Cola Classic." The Company will now provide bottlers with two kinds of sugar-sweetened cola syrups—old Coke syrup, to be packaged as Coca–Cola Classic, and new Coke syrup. The Company has informed its bottlers that for the present, it will supply them with Coca–Cola Classic syrup under the terms of their contracts for Coca–Cola, but without prejudicing the Company's rights.... As defendant's supplemental brief makes clear, the Company is ostensibly reserving the right to decide at a later time that the syrup for Coca–Cola Classic is not Coca–Cola Bottler's Syrup, even though the identical syrup was considered Coca–Cola Bottler's Syrup a few months ago....

*Diet Coke III*, 107 F.R.D. at 291.

After years of discovery, the parties now seek to resolve issues that go to the heart of the controversy: the definition of Coca–Cola Bottler's syrup, and the scope of the plaintiffs' trademark rights.[9]

## II. PRIOR OPINIONS

There are four previous published opinions in the *Diet Coke* cases, and five published opinions in the *Coke* case—excluding the opinions released today. An overview of the prior *Diet Coke* opinions and a brief summary of *Coke III* will aid the discussion.

### A. *Diet Coke I*

*Diet Coke I* denied motions by plaintiffs in both cases (83–95 and 83–120) for a preliminary injunction. The bottlers brought the motions protesting the Company's policy of offering diet Coke only to bottlers willing to waive temporarily their alleged rights under their existing contracts by executing the so-called "Temporary Amendment." The bottlers asked the Court for a preliminary injunction permitting them to purchase diet Coke syrup without forfeiting their interim rights.

The first question the Court addressed was the probability that the plaintiffs would succeed on the merits. Assessing this probability required the Court to determine whether differences between Coke and diet Coke made diet Coke per se outside the contracts' scope. If so, no further inquiry would be necessary.

To discover whether "the products share[d] common attributes," *Diet Coke I*, 563 F.Supp. at 1130, the Court compared the secret ingredients, sweeteners, publicly known ingredients, compositions, and tastes of the two products. The Court also noted the similarities between the two, including the name, packaging, and advertising of diet Coke. Taking these considerations into account, *Diet Coke I* concluded that "for at least some purposes diet Coke may be Coke." *Id.* at 1134.

The next step in evaluating probability of success was to examine the rights of the unamended bottlers, i.e., the 83–95 plaintiffs, who claimed diet Coke under their individual contracts and under the 1921 Consent Decrees.[10] The unamended bottlers' argued essentially two theories: (1) that they were entitled to diet Coke syrup because it was "Coca–Cola Bottler's Syrup" under the contracts and decrees; and (2) that their trademark rights comprised diet Coke as well as Coke.

The contracts between the bottlers and the Company are standard and in most cases identical. The contracts do not de-

---

**9.** The Company also has moved for summary judgment on the plaintiffs' antitrust claims.

**10.** The standing of the plaintiffs to enforce the Consent Decrees is treated in *Coke VI*.

fine the syrup to which the bottlers are entitled. In various places throughout a typical bottler's contract, several terms are used to refer to syrup: "syrup for bottling purposes," "Bottlers' bottle syrup, COCA-COLA," and "Coca-Cola syrup." Dkt. 1 (83–95), exh. J (Monahans Coca-Cola Bottling Company Bottle Contract).

A clue to the scope of the syrup term is found in Paragraph 10 of the Consent Decrees, which provides that the Company shall supply "high grade standard Bottlers Coca-Cola Syrup," containing at least 5.32 pounds of sugar per gallon. Dkt. 1 (83–95), exh. S, at 6 (Consent Decree). Whatever the term "standard Bottlers Coca-Cola syrup" means, it appeared to the Court at first glance that "the syrup must contain 5.32 pounds of sugar." *Diet Coke I,* 563 F.Supp. at 1135. Thus, the Court concluded that it was unlikely that diet Coke syrup fell within the meaning of Bottler's Coca-Cola syrup.

Next, the Court turned to the bottlers' arguments regarding their trademark rights. The bottlers' contracts contain provisions granting them certain rights to the trademarks "Coca-Cola" and "Coke" for use on bottled products within their respective territories. The plaintiffs asserted in *Diet Coke I* that these trademark rights entitled them "to obtain, bottle, and sell *any* product in receptacles bearing the name Coke or Coca-Cola." *Id.* at 1136. After reviewing the contractual lineage of the plaintiffs' trademark rights and the interpretation of those rights set forth in Judge Morris's opinion, I preliminarily held that, viewing the "maximum aggregate of rights that the plaintiffs may possess," *id.* at 1138, the Company had violated none of these rights. Therefore, the unamended plaintiffs failed to establish the requisite probability of success on the merits,

Because the trademark rights and rights under the original contracts and Consent Decrees of the amenders were identical to those of the unamenders, the amended bottlers similarly failed to establish a probabil-

ity of success on the merits. These plaintiffs, however, put forth a third ground in support of their motion: the language of the 1978 amendment. The last portion of ¶ 1(c) of the amendment states:

> In the event that the formula for Bottle Syrup is modified, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient. The Sugar Element would continue to fluctuate in the manner described above for sugar.

The unamended bottlers contended that the language "another sweetening ingredient" included saccharin.[11] The Company retorted that the clause did not apply because diet Coke is not a modified version of Coca-Cola. Upon reviewing the extensive interpretative evidence, the Court concluded that saccharin probably was "another sweetening ingredient" for the purposes of the amendment.

Having determined that the amended but not the unamended plaintiffs had satisfied the first prong of the standard for granting preliminary injunctive relief, a probability of success on the merits, the Court next addressed the second prong of the standard: a showing that irreparable injury will result in the absence of relief. Because "virtually every harm the bottlers ... articulated would be eliminated by signing the Temporary Amendment," *Diet Coke I,* 563 F.Supp. at 1141, the bottlers failed to meet their burden of showing irreparable injury. Accordingly, a preliminary injunction did not issue.

### B. *Diet Coke II*

*Diet Coke II* resulted from the amended bottlers' motion for summary judgment concerning the coverage of the term "Coca-Cola Bottler's Syrup." The amenders contended that, whatever the meaning

---

11. The sweetener now used in diet Coke is aspartame. This change does not materially affect the analysis.

of Coca–Cola Bottler's Syrup, their amended contracts cover the "modification" of that syrup by replacing sugar with "another sweetening ingredient." Dkt. 1 (83–120), exh. A–4, at 1 (1978 amendment to Alexandria Coca–Cola Bottling Company's contract). The Company replied that "Bottle Syrup" always has been intended to refer "to a single product, 'traditional' Coca–Cola." *Diet Coke II*, 637 F.Supp. at 1227.

Buttressing its "single product" argument, the Company asserted that there was no evidence that either it or the bottlers intended the 1978 amendment to encompass a "future, unknown diet product." *Id.* The Company further argued that Coca–Cola Bottler's Syrup must be defined by "certain essential attributes," *id.*, which diet Coke does not exhibit. Finally, the Company contended that there were genuine issues of material fact concerning the meaning of Coca–Cola Bottler's Syrup and the intent of the parties in 1978.

The Court concluded that the motion for summary judgment could not be granted.

> The threshold question is whether "Coca–Cola Bottler Syrup" includes a category of cola syrups, or whether the phrase can reasonably by read as referring to a particular product.... [T]o determine whether plaintiffs are entitled to diet Coke under their amended contracts, the Court must look to the nature of the parties['] business, their established course of dealing and, ultimately, the 1978 negotiations. After examining the parol and extrinsic evidence submitted by the parties, the Court concludes that the question of product coverage is a disputed issue of fact which precludes summary judgment.

*Id.* at 1228 (footnotes omitted).

### C. *Diet Coke III*

The third diet Coke decision treated the plaintiffs' motion to compel disclosure of several of the Company's secret formulae. Taking note of the renowned secrecy of Merchandise 7X, "the ingredient that gives Coca–Cola its distinctive taste," *Diet Coke III*, 107 F.R.D. at 289, and of the "impregnable barriers which the Company ... erected to protect its valuable trade secret," *id.*, the Court nevertheless ordered disclosure of the formulae for "old Coke" (Coca–Cola Classic), new Coke, caffeine free Coke, and diet Coke. The Court based its order of disclosure on the judgment that the plaintiffs had met their burden of demonstrating relevancy and a need for the formulae greater than the Company's need for protection of its secrets.

The relevance of the formulae followed from the plaintiffs' contentions that the terms "Bottlers' Coca–Cola syrup" and "bottle syrup" in their contracts "include any syrups manufactured by the Company for the purpose of providing any packaged soft drink sold under the names "Coca–Cola" or "Coke," including diet Coke." *Id.* at 295. One of the Company's main lines of defense had been to argue that the product were separate, and that "only syrup for sugar-sweetened Coca–Cola is covered by the unamended bottlers' contracts." *Id.*

The amended bottlers argued in addition to the arguments of the unamenders that the language of the 1978 amendment enabled amenders to receive diet Coke under existing contracts. The Company countered that the 1978 amendment language relied upon by the amenders was "inapplicable because diet Coke is a new and different product and is not modified Coca–Cola." *Id.*

Thus, for both amenders and unamenders, the different product argument became central. The plaintiffs could not realistically rebut this argument without information concerning ingredient similarity and dissimilarity and the reasons therefor. The Court rejected the Company's declaration that "except for the difference in sweeteners, ingredient similarities and differences [were] not relevant," *id.* at 296, and that "difference in taste, different essential characteristics of the beverages, different consumer markets for the beverages, and different consumer perceptions of the beverages," conclusively established that diet Coke fell outside the coverage of the contracts.

Finding the likelihood of harm to the Company "less than if the defendant's trade secrets were disclosed in litigation to competitors," *id.* at 299, the Court held that the Company must disclose its formulae for Coke Classic, new Coke, caffeine free Coke, and diet Coke, but not TAB or experimental colas never marketed. TAB's formulae was held irrelevant, although "[o]ther aspects of TAB ... might be relevant," and would be discoverable. *Id.* at 297 n. 7. The Court found the formula for TAB irrelevant because a showing by the plaintiffs that "diet Coke is more like Coke than like TAB does not tend to show that diet Coke and Coke are the same product." *Id.* at 297. Unlike caffeine free Coke, which is the same product as Coke according to the Company, *id.* at 296, TAB is not admittedly the same product as Coke, and the plaintiffs do not so contend. Therefore, TAB's formula is unnecessary for the plaintiffs to demonstrate that diet Coke is more similar to Coke than TAB is similar to Coke.

### D. *Diet Coke IV*

Unwilling to surrender its secret formulae, the Company chose not to obey the discovery order. The plaintiffs then moved for sanctions, requesting "entry of an order under Fed.R.Civ.P. 37(b)(2)(C) striking the Company's answer and entering judgment in favor of plaintiffs" on several counts of both complaints. *Diet Coke IV,* 110 F.R.D. 363, 366–67 (D.Del.1986). On the Court's suggestion, the parties attempted to agree on a preclusion order devised so as to "in no way prejudice plaintiffs and in no way benefit defendant," *id.* at 367, but were unable to come to terms, and submitted differing proposals.

Reviewing Rule 37(b)(2) and concluding that sufficient authority existed under subsection (A), the Court entered a preclusion order giving plaintiffs "the advantage of every possible inference that fairly could be drawn from the formulae evidence sought." *Id.* at 369. The Court also held that the "[d]efendant may not qualify [the favorable comparisons established by the order] by noting the difference in sweetener." *Id.*

The preclusion order is less sweeping than the plaintiffs desired, despite its treatment of formula issues as most favorable to plaintiffs, because an order "coextensive with the issues to which the withheld formulae evidence is relevant" would amount to the "functional[ ] equivalent [of] a default judgment." *Id.* at 369 & 369 n. 16. The Court noted that "[i]ngredient identity is not necessarily the same as product identity." *Id.* at 370. Additionally, "[c]ategories of evidence other than the formulae— such as taste identity, marketing history and strategy, consumer perceptions, and packaging—are urged by the Company as being relevant to the product identity issue. If the Company is correct in whole or in part, it may be able to overcome whatever showing could be made on the basis of the formulae evidence." *Id.* at 370.

*Diet Coke IV* allows the Company to rely on the sweetener difference between diet Coke and the other products concededly covered under the contracts only to the extent this difference relates to the elements of proof set forth in its preliminary statement of issues. *See* Dkt. 223 (83–95), Dkt. 160 (83–120).[12] The Court forbade the defendant, however, from using "formula evidence in any manner not outlined in defendant's preliminary statement of issues and at oral argument." *Diet Coke IV,* 110 F.R.D. at 372. Thus, the defendant generally is limited to arguments based on the course of conduct of the parties, the Consent Decrees' requirement that the syrup contain 5.32 pounds of sugar per gallon, and the plaintiffs' interpretations of their contracts. *Id.*

---

12. *See,* e.g., Dkt. 223 (83–95), at 3, where the Company lists as one of its elements of proof necessary to establish the defense that Coca-Cola Bottler's Syrup does not include diet Coke: "The course of conduct of the parties to the contracts, including the consistent practice of the Company since 1899 of selling only a high-caloric, sugar-sweetened syrup as "Coca–Cola Bottle Syrup" for the production of Coca–Cola, the consistent practice of the bottlers since 1899 of accepting a high-caloric sugar-sweetened syrup as Coca–Cola Bottle Syrup, and plaintiffs own interpretations of their contracts."

The preclusion order, which is set out in full as an appendix to the *Diet Coke IV* opinion, *see* 110 F.R.D. at 373–77, establishes, *inter alia,* the following facts:

(a) the formula for diet Coke syrup is within the range of formulae for syrups that have been sold as Coca–Cola Bottler's Syrup;

(b) diet Coke was formulated to taste like and otherwise resemble old Coke as much as possible for a low-calorie cola;

(c) the formula for diet Coke is significantly more like the formula for old Coke than the formula for any other version of Coca–Cola, including new Coke and caffeine-free Coke, is like the formula for old Coke;

(d) the formula for diet Coke is significantly more like the formula for new Coke than the formula for any other version of Coca–Cola, including old Coke and caffeine-free Coke, is like the formula for new Coke;

. . . .

(f) 99% of the total number of ingredients in diet Coke and old Coke, and in diet Coke and new Coke, are the same;

(g) the term "Coca–Cola Bottler's Syrup as used in the 1921 Consent Decrees and as used in the perpetual contracts between the defendant and the plaintiffs has included a wide variety of different syrups made with different ingredients having different tastes according to the different formulae, all of which were manufactured by the defendant and sold to the plaintiffs as "Coca–Cola Bottler's Syrup" under their perpetual contracts between July 21, 1899 and the current date;

(h) the differences in the ingredient compositions, chemical compositions, formulae, and tastes between some of the earlier versions of Coca–Cola Bottler's Syrup which the defendant manufactured and sold to bottlers as Coca–Cola Bottler's Syrup between 1899 and 1980 and other versions of Coca–Cola Bottler's Syrup which it manufactured and sold to bottlers during the 1899–1980 period were greater in number, greater in magnitude, more significant, and more noticeable to consumers than any such differences which exist between the syrup for diet Coca–Cola and the version of "Coca–Cola Bottler's Syrup" which defendant was manufacturing and selling to bottlers under their contracts during the period 1980 through April 1985, immediately prior to introduction of new Coca–Cola;

(i) the ingredient differences between diet Coke syrup and Coca–Cola Classic syrup are less significant between the two syrups as a whole, involve fewer ingredients and less significant ingredients from the standpoint of the ingredient composition, chemical composition, and formulae than the ingredient differences which exist between the syrup for Coca–Cola Classic and the syrup for new Coca–Cola, which was introduced by defendant on August 25, 1985, and has been sold by defendant as "Coca–Cola Bottler's Syrup" within the meaning of its contracts with plaintiffs since that date;

(j) prior to the defendant's introduction of new Coca–Cola syrup in April, 1985, all of the syrups which defendant formulated and sold to bottlers as "Coca–Cola Bottler's Syrup" to produce a carbonated soft drink that used the Coca–Cola or Coke trademarks, including diet Coke (and with the exception of caffeine-free Coca–Cola), shared the following attributes:

(1) they were caramel colored.

(2) they were "colas."

(3) they were sold for the purpose of being mixed with carbonated water, sealed in a bottle or can, and sold under the trademarks Coca–Cola or Coke for consumption as a beverage.

(4) they contained Merchandise No. 5, which is a flavoring compound composed of oils extracted from cola leaves and extracted from kola nuts; Merchandise No. 5 has been used by defendant in every version of "Coca–Cola Bottler's Syrup" produced since 1899.

(5) They contained Merchandise 7X, which is a secret blended emulsion of flavor oils which constitutes the core of the Coca–Cola formula, the only unique and distinctive and significant part of

Coca–Cola syrup, the source of unique and distinctive taste, aroma, mouthfeel, and other organoleptic properties of Coca–Cola that distinguish Coca–Cola from competing soft drinks such as Pepsi Cola; the defendant has used Merchandise 7X without change in every version of Coca–Cola Bottler's Syrup manufactured and sold to bottlers under the terms of their contracts from 1899 until the current date, with the exception of caffeine-free Coca–Cola syrup which contains a modified version of Merchandise 7X and new Coca–Cola syrup which contains no Merchandise 7X.

The preclusion order also makes the following findings with respect to diet Coke syrup:

(1) diet Coke syrup contains the identical amounts of Merchandise 7X, Merchandise No. 5, vanilla extract, and caffeine as the version of Coca–Cola Bottler's Syrup sold from 1980 through 1985 (Coca–Cola Classic syrup) (¶ 2.(l)(1))

(2) the defendant used the ingredients listed above "to match the taste, aroma, mouthfeel, and all other organoleptic properties of the bottled Coca–Cola as it existed during that period." (¶ 2.(l)(1))

(3) the defendant changed the publicly-disclosed ingredients in diet Coke to counterbalance the taste difference caused by the low-calorie sweetener

(4) the formula, compositional, taste, and "other physical organoleptic" distinctions between diet Coke and classic Coke "are much less significant, much fewer in number, and much less noticeable to the consumer than:

(a) the differences between Classic Coke and earlier versions of Coca–Cola Bottler's Syrup;

(b) the differences between new Coke syrup and the syrup for Classic Coke and previous versions of Coke;

(c) the differences (except for taste and organoleptic properties) between caffeine-free Coke syrup and Classic Coke syrup; and

(d) the differences between various versions of Coca–Cola Bottler's Syrup sold between 1899 and 1980."

(¶ 2.(l)(3))

New Coke syrup, even apart from the preclusion order, is deemed by the defendant to be Coca–Cola Bottler's Syrup. The preclusion order solidifies this admission into incontestable fact, and goes on to describe new Coke as:

produced by an entirely new and different formula, with materially different ingredients (including secret ingredients), a materially different flavor profile, and a materially different taste than [Coca–Cola Classic]; and ... the syrup for new Coca–Cola also materially differs in all of the respects enumerated above from any earlier version of "Coca–Cola Bottler's Syrup" which defendant has ever produced....

(¶ 2.(m)). The ingredient differences between new Coke and Classic Coke delineated in the order are as follows:

(1) new Coke's formula is not "a modification, extension, or improvement of the original Coca–Cola formula";

(2) new Coke does not contain Merchandise 7X, the most significant part of the original formula for Coke;

(3) none of new Coke's secret ingredients are common to the original Coke formula's secret ingredients;

(4) "the use of different secret ingredients in new Coca–Cola gives new Coca–Cola a flavor complex, 'flavor profile,' and taste that is materially different from the flavor complex, profile, and taste of the version of 'Coca–Cola Bottler's Syrup' which [was] sold to bottlers from 1980 through April 1985 ..., and all of which are major, significant, and give new Coke a significantly different taste."

(¶ 2.(m)).

Paragraph 2.(n) of the order finds that the only compositional difference between diet Coke and (1) new Coke, (2) Classic Coke, and (3) caffeine-free Coke, is the different sweetener. Paragraph 2.(o) states that the defendant planned to formulate diet Coke so as to reproduce as nearly as possible the taste and appearance of the three colas listed above. Paragraph 2.(q) explains that the secret ingredients in diet

Coke, new Coke, and/or Classic Coke are identical and used in the same ratios.

The Court allowed the plaintiffs to choose among the facts included in the preclusion order as they saw fit. Thus, if the plaintiffs decide that diet Coke's similarities to new Coke are more advantageous to them than diet Coke's similarities to Classic Coke, the formula-related facts supporting the comparison are available to them. *See, e.g., Diet Coke IV,* 110 F.R.D. at 370–71 n. 19. The overarching goal of the preclusion order was to prevent any prejudice to the plaintiffs and to prevent any benefit to the defendant. *Diet Coke IV,* 110 F.R.D. at 369.

### E. *Coke III*

In *Diet Coke IV,* the Court reserved the question of whether the Elizabethtown litigation would yield a definition of sugar applicable to the diet Coke cases. 110 F.R.D. at 372 n. 23. Now that sugar has been defined in *Coke III* as sucrose made from cane or beets, no reason appears for failing to give that definition preclusive effect here. The Court settled on a definition after an extensive trial, *see Coke III,* 654 F.Supp. 1388, and adhered to that definition in the face of the defendant's motion for amendment. *See Coke IV,* 654 F.Supp. 1419. Principles of collateral estoppel prevent the defendant from asserting a definition of sugar inconsistent with the holding of *Coke III.* Therefore, "sugar," for the purposes of the diet Coke cases will mean sucrose from cane or beets: a definition that excludes HFCS.

### III. THE SUMMARY JUDGMENT STANDARD

The standard applicable to the consideration of summary judgment motions is laid out in three recent United States Supreme Court decisions: *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These decisions refocus the summary judgment standard, clarifying the movant and non-movant's responsibilities. The movant must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a crucial element of his or her case. The non-movant must then identify portions of the record which tend to support the allegedly unsupported element. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

Significantly, this trilogy of cases assures the trial court that where the party bears the burden of proof on an issue, and the evidence pertaining to that issue plainly falls short of the party's burden, summary judgment is proper. *See Anderson,* 477 U.S. 248–49, 106 S.Ct. at 2510–11. With these principles in mind, I will turn to the parties' motions.

With these extended preliminaries out of the way, the Court now will address: (1) defendant's motion for summary judgment as to the definition of Coca-Cola Bottler's Syrup, and the plaintiffs' cross-motion on this issue; (2) the amended plaintiffs' separate cross-motion concerning their rights under the 1978 amendment; (3) the defendant's motion for summary judgment in both cases on the plaintiffs' trademark and anti-dilution claims, and the plaintiff's responding cross-motions; and (4) the defendant's motion for summary judgment on the plaintiffs' antitrust claims.

### IV. COCA–COLA BOTTLER'S SYRUP DEFINED

A good portion of this litigation has been devoted to inspecting the uncertain limits of the phrase "Coca-Cola Bottler's Syrup." Where those limits fall will largely determine the merits of the plaintiffs' claims to diet Coke under their existing contracts. Each side has moved for summary judgment on the issue. The Company has moved for summary judgment in both cases. Its motion in the unamenders case is limited to the question of the plaintiffs' rights to diet Coke syrup at the formula price established in the Consent decrees. As to the amended plaintiffs, the Company moves for summary judgment only to the extent that these plaintiffs rely on the un-

amended portions of their contracts. The unamended and amended plaintiffs have cross-moved separately, asserting different grounds. The following section deals only with the issues common to both groups of plaintiffs. The parties disagree on which undisputed facts are material and on the inferences to be drawn from those facts.[13]

The parties also disagree on the proper formulation of the issue: the Company suggests that the crux of the question lies in "whether the sugar-based pricing formula of the 1921 Consent Decrees and the unamended bottle contracts applies to the sugarless syrup for diet Coke" (Dkt. 396 at 2); the bottlers, on the other hand, frame the core issue as whether diet Coke falls within the scope of the specialized trade term "Coca–Cola Bottler's Syrup." The Court will proceed with the plaintiffs' construction of the question, because that suggested by the defendant, while not wrong, inverts the inquiry. The pricing system set up by the Consent Decrees does relate to the definitional question. The sugar-based pricing may weigh in favor of an interpretation of Coca–Cola Bottler's Syrup that excludes diet Coke. However, other factors may weigh in favor of inclusion: the simple question is, is it in or is it out?

### A. *The Parties' Contentions*

The Company hinges its motion on the cumulative effect of a variety of factors: the intent of the parties to the 1921 Consent Decrees; the parties' course of performance; the explicit requirement of "sugar" in the decrees; the sugar-based pricing of the decrees and derivative contracts; and the asserted reservation by the Company of the right to exclude "sugarless" colas from the coverage of the contracts. The Company also cites the deposition testimony of several individual bot-

tlers, claiming the testimony is inconsistent with the bottlers' legal theories.

The plaintiffs' rebut the Company's reasoning with five key assertions of their own: (1) that the logical extension of the preclusion order directs a finding that diet Coke syrup is Coca–Cola Bottler's Syrup; (2) that HFCS is not sugar for any purpose in the context of this litigation; (3) that the Company's conduct in treating "sugarless" (i.e., HFCS–sweetened) syrups as Coca–Cola syrup prevents the Company from arguing that diet Coke syrup is not covered because it lacks sugar; (4) that the only logical definition encompassing all of the various syrups treated as Coca–Cola syrup is a functional one; and (5) that testimony of individual bottlers concerning the legal aspects of their contracts is irrelevant.

In support of their cross-motion, the plaintiffs maintain that their proffered functional definition best represents the intent of the contracting parties and the true scope of the contracts as they have evolved. The plaintiffs also point to the collective effect of the preclusion order,[14] the ruling in *Coke III* that HFCS does not fall within the contractual extent of the term sugar, and the defendant's allegedly binding admissions and conduct. Taking these factors in combination, according to the plaintiffs, leads surely to the conclusion that diet Coke syrup *is* Coca–Cola Bottler's Syrup. Finally, the plaintiffs rely on analogies to other decisions concerning the treatment of new products in the context of long-term contractual relationships.

### B. *Coca–Cola Bottler's Syrup: Definitions*

The parties have devised four diverse definitional schemes for analyzing the scope of Coca–Cola Bottler's Syrup under the contracts: (1) functional (plaintiffs); (2) sweetener-based (defendant); (3) range of

---

**13.** Although the facts material to one side's legal theories may be undisputed, each side contends that in the event its theories are rejected, material issues of fact exist preventing grant of the other side's motion.

**14.** The plaintiffs' preclusion order arguments to some degree reach too far. For example, they assert that the preclusion order established that

diet Coke is within the range of products that have been treated as Coca–Cola Bottler's Syrup. This is unexceptionable. However, the plaintiffs overreach when they claim that the preclusion order "conclusively establishes ... that diet Coke is covered by the bottlers' contracts." Dkt. 400 at 97.

products (plaintiffs); and (4) literary (both plaintiffs and defendant).[15] The Court will address these possible definitional frameworks in turn.

### 1. The Functional Definition

The plaintiffs' functional definition runs something like this: Coca–Cola Bottler's Syrup is any syrup produced by the defendant for the purpose of producing a soft drink sold in association with the name Coca–Cola. An alternate form of the functional definition suggests that any caramel-colored, carbonated cola beverage that might subsequently be produced and marketed under the Coca–Cola mark would be covered under the contracts. The plaintiffs assert that no other definition of Coca–Cola Bottler's Syrup other than the functional definition encompasses "the wide variety of syrups, including the syrup for new Coke, that have been sold by defendant under the bottlers' contracts as Coca–Cola Bottler's Syrup." Dkt. 400 at 6.

The defendant attacks the plaintiffs' functional definition as inconsistent with its arguments in the Coke case, as a newly-hatched creature of this litigation and not a fair representation of contractual intent, and as simplistic and overly trademark-intense. The defendant insists that the plaintiffs' functional definition does not comport with their objection to the use of HFCS, which is the subject of the Coke case. The plaintiffs retort that their objection to the use of HFCS–sweetened syrup was due to the Company's failure to pass through the savings realized from the cheaper sweetener. Their objection thus was to the pricing of HFCS syrup; they did not object to the Company's practice because they viewed HFCS syrup as outside the scope of the term Coca–Cola Bottler's Syrup. Rather, they objected to the pricing of HFCS syrup based on the market price of granulated sucrose when the syrup contained no su-

crose (or contained only 75% or 50% sucrose).

The defendant finds the plaintiffs' functional definition noxious also because of its recent appearance. The Company apparently believes that the functional definition cannot explain the coverage of the syrup term because the plaintiffs did not come up with it earlier. The age of plaintiffs' arguments, however, is of little importance. Some of the defendant's theories also have sprung full grown, Athena-like, from the brains of counsel in this litigation, rather than from the minds of the contracting parties.

One possible difficulty with the functional definition which the defendant has correctly identified, however, is the sugar-based pricing provisions of the contracts. The contracts most likely import the Consent Decrees' requirement that the syrup provided by the Company to the bottlers must contain 5.32 pounds of sugar per gallon, a possibility recognized in *Coke V. See* 668 F.Supp. at 916. Paragraph 10 of the Consent Decrees also performs a quality control function; a function hard to reconcile with the plaintiffs' functional definition.[16] However, the extent to which the definition of Coca–Cola Bottler's Syrup may be controlled by the pricing and sweetener provisions of the decrees is debatable.[17]

### 2. Sweetener–Based Definition

A second possible definition, one favored by the defendant, is to accept "sugar" as a definitional characteristic of Coca–Cola Bottler's Syrup. In other words, the defendant proposes that, whatever Coca–Cola Bottler's Syrup may mean, it cannot mean a syrup without at least 5.32 pounds of sugar per gallon. Interestingly, the Company suggests that "sugar" is a necessary characteristic of Coca–Cola Bottler's Syrup, as if the Court's definition of that term in *Coke III* were irrelevant here. Under the

---

**15.** Although the plaintiffs attribute the literary definitional scheme to the defendant, in the Court's view, both sides have utilized it to some degree.

**16.** In particular, the Court fails to see at this juncture how diet Coke syrup falls within the term *"standard"* Coca–Cola Bottle Syrup" found

in ¶ 10. Diet Coke may indeed come within this phrase. However, the meaning of the word standard as used in this setting does not appear undisputed.

**17.** *See infra* Section C. at pages 114–117.

*Coke III* definition of "sugar," which is the definition applicable to the Consent Decrees, HFCS–sweetened syrup is not sugar-sweetened syrup, although the two are both "highly caloric" and indistinguishable in taste. Additionally, the Company has tested HFCS as different from "sugar," giving amended bottlers the benefit of HFCS's lower cost through the provisions of the 1978 Amendment.

Aside from the inconsistency of the defendant's position with respect to sugar, the sweetener-based definition fails to take into account the established ingredient similarities between diet Coke and Classic Coke, and the dissimilarities between new Coke and Classic Coke. Moreover, sweeteners alone cannot answer the question of contractual coverage. Though relevant, neither sweetener differences nor formula similarities are dispositive.

### 3. Range of Products Definition

The third option for defining Coca–Cola Bottler's Syrup is the range of products theory. This definition owes its existence to the preclusion order. By substituting "products" for "formulae" in the preclusion order, the plaintiffs end up with all the premises they need to build logical syllogisms demonstrating that diet Coke is covered by the term Coca–Cola Bottler's Syrup. The Company designates this argument the "product identity" argument.

As noted above, the preclusion order takes as given that the formulae evidence weighs most heavily in favor of the plaintiffs. The formulae and formulae-based facts established by the order place diet Coke as close as possible to new Coke, which is covered by the contracts, while placing new Coke as far as possible from previous syrups covered by the contracts. *See Diet Coke IV*, 110 F.R.D. at 371 n. 22 ("The Order lets plaintiffs establish that from a formula perspective 'the gap between old Coke and new Coke is as wide as the Grand Canyon and that the gap between diet Coke and new Coke is perhaps

as narrow as the width of a piece of paper.' ").

The preclusion order, however, does not establish that diet Coke *is* Coca–Cola Bottler's Syrup. *Diet Coke IV*, 110 F.R.D. at 371 n. 20. "While the formulae are relevant to this litigation, it is equally clear that the formulae will not necessarily determine the outcome of this litigation: 'To define a product solely by its chemical composition disregards other important definitional criteria.' " *Id.* at 369–70 (quoting *Diet Coke I*, 563 F.Supp. at 1134).

### 4. The Literary Definition

Lastly, the plaintiffs have made much of the defendant's "Humpty–Dumpty" definition of Coca–Cola Bottler's Syrup.[18] The Carrollian interpretative model, though, is not peculiar to the defendant. Both sides have indulged in "it means what I choose it to mean" pronouncements. For example, one bottler has expressed the belief that the contract entitles him to every syrup produced by the defendant, even the syrup for Diet Minute Maid. *See* Dkt. 396A (83–95), exh. 14, exh. 18 at 32–33, 53–54 (Montgomery dep.). Company officials, however, appear to be even more fond of the Humpty–Dumpty view than individual plaintiffs:

> Q.  And it [new Coke syrup] is under The Coca–Cola Company's interpretation of the contract Coca–Cola Bottlers Syrup, even though it is a new product made according to a new formula?
>
> A.  Yes.
>
> Q.  And the syrup which was being manufactured on April 22, 1985, under the old formula was also Coca–Cola bottlers syrup?
>
> A.  At that time, yes.
>
> Q.  And is it any longer Coca–Cola bottlers syrup?
>
> A.  Coca–Cola Bottlers Syrup is what is currently being manufactured as Coca–Cola bottlers syrup.

Dep. of Brian G. Dyson, President of Coca–Cola USA, at 131–32 (Dkt. 241) (83–95).

---

**18.**  Humpty Dumpty's definitional theories are well-known:

When I use a word, ... it means just what I choose it to mean—neither more, nor less.

L. Carroll, Through the Looking Glass and What Alice Found There, ch. vi (1871) (*reprinted in* The Annotated Alice 269 (M. Gardner ed., 1960)) (statement of Humpty Dumpty).

Q. So in your opinion whether or not something is Coca–Cola bottlers syrup does not depend on whether or not it is made in accordance with a formula that The Coca–Cola Company has previously used to manufacture Coca–Cola bottlers syrup which it sold to bottlers; is that correct?

A. In my opinion it is only if it is being made by The Coca–Cola Company expressly for the purpose of being sold to Coca–Cola bottlers as Coca–Cola syrup.

*Id.* at 134–35 (Dkt. 241) (83–95).

Roberto C. Goizueta, Chairman of the Board of The Coca–Cola Company, testified:

Q. Is the syrup from which new Coke is made Coca–Cola Bottle Syrup?

A. It is.

Q. Is the syrup from which old Coke, that is, the Coke that was being produced on or before April 22, 1985, Coca–Cola Bottle Syrup?

MR. JONES: Was it Coca–Cola Bottle Syrup at the time; is that your opinion?

MR. BONDURANT; Was it at the time.

THE WITNESS: Yes.

Q. Is it at the present time?

A. No.

Q. So the syrup with the identical formulation, in effect, prior to April 22, 1985, in your opinion is no longer Coca–Cola Bottle Syrup?

A. No.

Q. Can you tell me why it is no longer Coca–Cola Bottle Syrup?

A. Number one, it is not being produced to sell to Coca–Cola bottlers who produce a product to be sold as Coca–Cola. The syrup now being produced as the Coca–Cola Syrup and sold to bottlers as Coca–Cola Syrup—sold to bottlers of Coca–Cola to be produced into the beverage Coca–Cola is the syrup which has a different composition.

. . . .

Q. I'm trying to understand why you say the syrup that was produced up through April 22, 1985, is not Coca–Cola Bottle Syrup.

A. It was then.

. . . .

Q. Is there any other reason you said that that syrup is no longer Coca–Cola Bottle Syrup other than the company has chosen to discontinue its manufacture and sale to bottlers?

A. I have trouble understanding the words 'has chosen.' I mean, effective April 23 of 1985 there is a syrup that has those characteristics I mentioned before which is sold as Coca–Cola Bottle Syrup to bottlers for the bottlers to turn that syrup into a beverage and market that beverage under the brand Coca–Cola. . . . *If the company does not call that Coca–Cola syrup Bottle Syrup, it is not.*

Goizueta Dep. at 109–11 (Dkt. 249) (83–95) (emphasis added).

As the parties recognize, simply choosing a definitional theory and applying it to diet Coke will not advance the analysis. Rather, the possible theories must be examined in the context of the conventional standards of contractual interpretation: the original contracting parties' intent; the course of performance under the contracts; and the language[19] of the agreements themselves.[20]

### C. *Original Intent*

According to the Company, the parties to the 1921 Consent Decrees intended for "Bottler's Coca–Cola Syrup" to be a sugar-

---

**19.** This ordering of the analysis may appear backward. The unique nature of this particular contractual relationship, coupled with the ambiguity of the disputed language, dictates beginning contractual interpretation with an assessment of the parties' intent and that manifestation of that intent through more than eighty years of performance. Starting with the contractual history before proceeding to the language of the contracts sets the necessary context for reading the contractual terms.

**20.** The parties' litigation-inspired views of the legal interpretation of their own contracts, however, are of limited usefulness. *See* Dkt. 400 (83–95) at 91–93.

sweetened syrup. The 1920 litigation focused on the sugar content of the syrup, in the defendant's view, and on pricing the syrup in an objectively verifiable manner. The volatility of the price of sugar precipitated the controversy between the bottlers and the Company. In a nutshell, the Company's view is that because no diet product existed in 1921, the parties' agreements cannot cover diet Coke.

The plaintiffs take the contrasting position that the parties' original intent was to include each new version of Coca–Cola syrup in the contracts, because that had been the practice prior to the Consent Decrees, and no contrary intent was manifested in them. The plaintiffs concede that the decrees indicate no express intent to cover sugarless products. However, they argue that the logical inference to draw from the course of performance prior to the decrees was that new versions of the syrup were automatically included in the contracts, and that therefore the lack of evidence of an intent to reverse this practice is more telling than the lack of an express intent to include modified versions of the syrup.

The evidence available may be read in a fashion favorable to either side: each side's arguments have attractive aspects. For example, the Company's argument finds support in the language of paragraph 10 of the decrees. The problem with this literal language argument, however, is that it assumes the parties considered new products and rejected them, or at least that they intended the agreement to cover only the single product existing in 1921. The Company admits that the contracts are not limited to a single product. *See* Dkt. 401 (83–95) at 28 n. 12. Another defect is that the defendant's argument does not recognize the reality of the unique contractual relationship as spelled out by Judge Morris in *Coke 1920. See,* 269 F. at 810–11. Judge Morris found that the Company sold the bottlers an entire potential business: the business of bottling and distributing Coca–Cola, the development of which was accomplished by the bottlers alone. The plaintiffs argue that diet Coke is merely another facet of the business previously sold to them.

Furthermore, the evidence of the parties' course of performance under the 1899 contract leaves no room for doubt that in 1920 both the bottlers and the Company interpreted the terms "Coca–Cola syrup" to encompass each new version of Coca–Cola syrup as it was developed for sale by the Company. Given this premise, the plaintiffs' argument concerning the lack of evidence of intent to reverse this practice gains credence.

The defect in plaintiffs' reasoning is its failure to account for the purposes served by paragraph 10. As the defendant puts it:

> More fundamentally, plaintiffs have yet to come to grips with the irrationality of applying a pricing formula based upon sugar to a product containing no sugar of any kind.

Dkt. 396 at 28.

The plaintiffs assert that the quality-control and price protection functions of that paragraph are not determinative of the scope of the subject matter of the contract. Nevertheless, they must be considered. The plaintiffs' position requires severely downplaying these functions of paragraph 10.

The parties to the Consent Decrees did display a concern with resolving pricing disagreements: the Company in order to avoid the trap of fixed pricing, and the bottlers to avoid being subjected to the brunt of the Company's unwise sugar-purchasing decisions. The parties had a mutual desire for objective pricing. They settled upon what they thought was a verifiable value of sugar. The bottlers, moreover, wished to prevent the Company from circumventing the pricing provisions of the decrees and also wished to protect themselves from the lower quality syrups manufactured during the war—thus, the requirement of at least 5.32 pounds of sugar.

But, pausing briefly to consider the dilemma, it becomes apparent that the definition of Coca–Cola syrup and the application of a pricing formula are separate inquiries. Whether the pricing formula for sugar can sensibly apply to a syrup containing no sugar is obviously questionable, and possi-

bly may argue for excluding diet Coke from contract coverage whether or not it sensibly fits within the definition of Coca-Cola syrup. However, the task of determining the scope of that term does not logically require determining the pricing system which might apply in the event that diet Coke falls within the fair scope of the term Coca-Cola syrup.

The plaintiffs do not contend that the parents and the Company intended in 1921 for their agreements to encompass a new diet product, unforeseen in 1921. Instead, the plaintiffs' position appears to be that the parties assumed their agreement covered evolutionary products, although the agreements do not explicitly deal with such a circumstance, both sides would have considered it to be within the coverage of the contracts. The fact that the parties did not expressly contemplate diet Coke does not end the analysis. *See* E. Farnsworth, *Contracts* § 7.15 (1982).

Additionally, these criticisms of the plaintiffs' original intent arguments apply with equal force to the inclusion of new Coke and HFCS-sweetened products as Coca-Cola Bottler's Syrup. The Company claims that the plaintiffs objected to HFCS-sweetened syrups on the grounds that such syrups were not Coca-Cola Bottler's Syrup. However, the bottlers viewed HFCS-sweetened syrups as not in compliance with their contracts because the Company continued to price the syrup as if it contained sugar. The Court finds it difficult to believe that the plaintiffs would have filed the Coke lawsuit if the Company had passed through the savings from using HFCS to unamended bottlers as well as amenders.

In sum, the original intent of the drafters of the Consent Decrees and corresponding amendments to individual bottler's contracts fails to significantly advance the analysis. On the one hand, the Company's argument that sugar is a definitional characteristic is straightforward and appealing. On the other hand, it is rather disingenuous to accept an argument that, logically extended, would allow the Company: (1) to formulate a syrup with less than 5.32

pounds of sugar per gallon but otherwise identical to Coca-Cola Bottler's Syrup; (2) to call the new syrup "un-Coca-Cola Bottler's Syrup"; and (3) take the position that it fell outside the contracts. Obviously, if the Company provided the bottlers with syrup containing only 5.00 pounds of sugar per gallon, the syrup would not conform to the requirements of the contracts and the Company would be in breach. This does not mean, however, that the low-sugar syrup would not be "Coca-Cola Bottler's Syrup."

Defendant's response that the Company would not be able to sell syrup to anyone but the bottlers because of the exclusive nature of the contracts is beside the point. That the Company would not be able to breach the contracts in one manner does not show that by behaving in another manner, the Company avoids breach. Moreover, if sugar were the defining characteristic, then only by accepting the defendant's definition of that term can the Court reach the conclusion that diet Coke falls outside the contract while new Coke falls within it.

Plaintiffs' original intent argument—that all syrups developed for sale under the trademark are Coca-Cola Bottler's Syrup—while less obvious, and further from the explicit language, may hold more truly to the parties' positions in 1921. When the Company contracted with Whitehead and Thomas in 1899, it sold more than the right to bottle Coca-Cola; it sold the bottling business. Outside the reserved territories, the Company had no interest in the bottling business. It contributed no capital to the development of that business. Judge Morris found that in 1899, the business itself was sold, along with certain rights in the trademark.[21] Another pertinent consideration is the perpetual nature of the contract. It appears to the Court that the sale of the business, combined with the perpetual nature of the obligations between the Company and the bottlers, indicate that the scope of the contract is broader than the Company admits. This comports with Judge Mor-

21. *Coke 1920,* 269 F. at 806–08.

ris's assessment of the agreements. It also provides the most coherent framework for distinguishing between products sold by the Company that fall within the contracts and those that fall outside the contracts. Whether the plaintiffs' position ultimately will be adopted, though, depends on the answer to the question posed by the quality control function of ¶ 10: i.e., can diet Coke be standard Coca–Cola syrup?

## D. *Course of Performance*

The course of performance under the contracts confirms the Court's view that the transfer of the business partially validates the plaintiffs' functional definition. For example, until the introduction of diet Coke, all syrups containing Merchandise 7X and bearing the trademark have been sold as Coca–Cola Bottler's Syrup. *See Diet Coke IV,* 110 F.R.D. at 374, ¶ 2(j)(4), (5). The plaintiffs have not emphasized this argument in the contract section of their briefs,[22] reserving it for the trademark section.[23] Regardless of the merits of the plaintiffs' trademark arguments, however, the Court regards the functional definition as inadequate in and of itself to dispense with the quality-control questions raised by ¶ 10.

### 1. 1899–1920

The plaintiffs assert that the course of performance during this period proves that in the view of both sides the terms "Coca–Cola syrup" and "bottle syrup" comprised each new version of syrup developed for sale under the trademark. This is not disputed by the defendant. When bottle syrup first came into being, the parties assumed that it was covered by the contracts. Other modifications to the syrup formula likewise were not viewed as affecting the parties contractual obligations.

In the Company's favor, World War I experimentation with alternative sweeteners proved unsatisfactory to the bottlers and the public. Dkt. 396 at 16–19. During the period from 1899 to 1920, but for the experimentation, the Company sold only "sugar-sweetened, high caloric syrup for producing Coca–Cola." *Id.* at 14. And the modifications of Coke syrup were modifications caused by governmental regulation or were meant to improve Coke syrup itself, not to generate another concurrently sold version of Coke syrup.

### 2. 1920–1980

The parties' course of performance during these six decades sheds little light on the present controversy. One notable event, however, was the creation of TAB.

TAB was not sold as Coca–Cola Bottler's Syrup. It was distributed to the bottlers under separate term contracts. However, unlike with diet Coke, the Company did not attempt to exploit the good will and name recognition of Coca–Cola. Moreover, the TAB contracts contained a broad reservation of the parties' rights:

> Neither the execution, nor the performance of this contract by either Party hereto, shall affect in any manner either Party's rights, responsibilities or covenants to the other Party under contracts between the Parties hereto for the bottling, canning, and premixing of Coca–Cola; it being the intention of the Parties hereto that during the term of said TAB contract and upon any termination of said contract all rights, obligations and covenants of the Parties hereto under said contracts shall be the same as if this contract had not been executed, the Parties hereto agreeing that the action of the Parties with regard to TAB shall not

---

**22.** The plaintiffs instead have centered their arguments on the preclusion order. Relying heavily on that order, the plaintiffs declare that diet Coke is within the range of products that have been treated as Coca–Cola Bottler's Syrup. In making their declaration, they jump from the preclusion order's formulae findings directly to the conclusion that diet Coke's formula similarities dispose of the question of product coverage under the contracts. The preclusion order sweeps less widely. It establishes facts favorable to the plaintiffs that deal with matters other than the formula. *See* Order ¶ 2(h). It does not establish that diet Coke is covered by the contracts.

**23.** The question of the interpretation of "right to use" in the context of trademark law as it existed more than sixty years ago will be addressed in the section of this opinion dealing with the trademark issues.

be construed as an interpretation of the contracts presently existing between BOTTLER and COMPANY.

Dkt. 63, exh. N, ¶ 49.

The parties disagree regarding the effect of the clause on the course of performance evidence. The plaintiffs point to the reason for the reservation of rights clause: the Thomas Co. had threatened to sue the Coca–Cola Company "on the theory that TAB was a modified version of Coca–Cola ... and was a substitute for Coca–Cola." Dkt. 400 (83–95) 24, 89. Additionally, the plaintiffs remind the Court of its ruling in *Diet Coke III* that the formula for TAB is irrelevant. This ruling, according to the plaintiffs, came in the wake of a Company argument that "TAB was irrelevant to the entire *diet Coke* controversy." Dkt. 400 at 90. The plaintiffs' characterization of the Court's ruling in *Diet Coke III* is off base. The Court ruled that while the *formula* for TAB was irrelevant, other aspects of TAB might be pertinent.[24]

The Company responds that while the *formula* for TAB is irrelevant, the Company's refusal to treat TAB as a Coca–Cola Bottler's Syrup is neither irrelevant nor barred by the reservation of rights clause. The Company insists that its "consistent refusal to agree that TAB syrup is Coca–Cola Bottler's Syrup demonstrates from a course of performance standpoint that the Company has not acceded under any circumstances to a definition of Coca–Cola Bottler's Syrup that embraces anything other than a sugar-sweetened syrup...." Dkt. 401 at 53.

Thus, the plaintiffs claim that the parties' conduct regarding TAB supports the bottlers because it shows that they did not acquiesce in the Company's decision to treat the product as outside the contracts.

The Company's position mirrors that of the plaintiffs; the Company characterizes the TAB conduct evidence as showing the Company's consistent exclusion of "sugarless colas" from the definition of Coca–Cola Bottler's Syrup. The Court concludes that the course of performance evidence with respect to TAB, assuming it is available for consideration,[25] favors neither the Company nor the plaintiffs in any significant fashion.

### 3. 1980–1988

The first major event relevant to the parties' course of performance for this time period occurred in 1980, when the Company began substituting HFCS for sugar in the syrup sold to both amended and unamended bottlers. The Company "passed through" the savings from the use of HFCS to the bottlers who had amended their contracts, but not to the unamenders. By invoking the pass-through provision of the 1978 amendment, the Company demonstrated its belief that HFCS was "another sweetening ingredient" for the purposes of paragraph 10 of the amenders.[26] *Coke III* has now illustrated that HFCS is not sugar for the purposes of the Consent Decrees. Yet the Company asserts that syrup sweetened with HFCS is Coca–Cola Bottler's Syrup. The net result is the Company is now selling what it insists is Coca–Cola Bottler's Syrup, and this syrup contains no sugar—much less 5.32 pounds of sugar.

The Company continued to use HFCS in syrup sold to unamended bottlers until 1987, when it informed the unamended bottlers remaining in the Coke case that they would be supplied with sucrose-sweetened syrup only, unless they signed the 1978 amendment. Citing imminent damage to their businesses due to the disruption of cross-packaging arrangements and so forth

---

**24.** *See* discussion of *Diet Coke III, supra* section C at pages 106–107.

**25.** The reservation of rights clause may be read to preclude use of the parties conduct with regard to TAB in interpreting the perpetual contracts. The language of the reservation of rights clause is broader than that of the letter agreements governing caffeine-free Coke. *See Diet Coke III,* 107 F.R.D. at 297.

**26.** The Company maintains that it believed, for purposes of the unamended bottlers' contracts, that HFCS was "sugar," and that its position was plausible and did not constitute a willful breach. There is no need to reach the question of the Company's intent at this point: course of performance examinations look to conduct and its clues to intent, not to declarations of subjective intent.

if the Company pursued such a course, the *Coke* bottlers brought a preliminary injunction motion. This Court denied that motion in *Coke V*, 668 F.Supp. 906, holding that the bottlers had failed to establish the requisite probability of success on the merits of their claim of entitlement to HFCS-sweetened syrup as "standard" syrup.

The second major event affecting the analysis of the parties' course of performance in recent years was the introduction of diet Coke, which led to the present lawsuits. This event, of course, does not illuminate the course of performance inquiry. It does, however, show that neither side's conduct with respect to diet Coke betrays a contract construction inconsistent with that now proposed by them.

The third major course of performance event was the debut of new Coke. Despite extensive fanfare, the new product did not perform quite as the Company apparently hoped. Responding to consumer demand, "old" Coke was reintroduced as Coca–Cola Classic a few months after new Coke hit the streets. Already immersed in this litigation, the Company took the remarkable position that Coke Classic was pseudo-syrup, i.e., it would be sold to the bottlers under their existing contracts conditionally—with the Company putatively reserving the right to determine at a later time that Classic syrup was not Coca–Cola Bottler's Syrup.

This third event plainly strongly supports the bottlers' theories. First, it undercuts, if not destroys, the Company's former position that only one form of Bottler's Syrup was available to the public at any given time. Second, under the regime of the preclusion order, the only compositional similarity between new Coke and Classic Coke is that both are highly caloric relative to diet Coke. Furthermore, the Company's attempt to reserve the right to later treat Classic syrup, which until the birth of new Coke was unquestionably Coca–Cola Bottler's Syrup, brings to mind the Alice in Wonderland definitional framework mentioned above.

Overall, the Court is satisfied that the course of performance evidence is too mixed to be determinative.

### E. *The Language of the Agreements*

A more conventional contract analysis might begin with an examination of the language of the agreements at issue: here, because of the ambiguity of the disputed terms and the age of the agreements, an examination of the language yields little without an understanding of the history of the parties' contractual relationship. Having examined that history, a close look at the contractual language is more fruitful.

The contract between the Thomas Co. and the Elizabethtown bottler is representative of the unamended bottlers' contracts and reads as follows in pertinent part:

FIRST: ... [T]he party of the first part [the parent bottler, Thomas Co.] hereby assigns to the party of the second part [the actual bottler, Elizabethtown] the sole and exclusive right and license that it received by approved transfer from The Coca–Cola Company, to use and vend on bottled Coca–Cola the trademark name Coca–Cola, and all labels and designs pertaining thereto, in connection with the product "Bottled Coca–Cola" in the territory hereinbefore described ... and said party of the first part agrees to obtain and furnish to party of the second part ... sufficient syrup for bottling purposes to meet the requirements of party of the second part....

SECOND: Party of the first part does hereby select party of the second part as its sole and exclusive customer and licensee for the purpose of bottling bottlers' Coca–Cola syrup ...

. . . .

FOURTH: In consideration of the above assignment of the rights ... and ... further, in consideration of the consent of the party of the first part to the use of the name Coca–Cola ... on the product so sold, party of the second part agrees:

(a) Not to ... offer for sale ... any product that is a substitute for or an imitation of Coca–Cola, nor any prod-

uct that can be used unfairly with Coca–Cola....

(b) Not to sell Bottler's Coca–Cola in syrup form, and not to bottle any Coca–Cola syrup that is made for fountain purposes.

(c) To bottle Coca–Cola in the following manner: To have it thoroughly carbonated, put in bottles, using one ounce of Bottler's Coca–Cola syrup in a standard Coca–Cola bottle....

(d) To buy of or through said first party all the Coca–Cola syrup required or used by said second party ... and to pay for said Coca–Cola syrup on the following scale of prices:

One Dollar and Thirty ($1.30) cents per gallon ... and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound....

....

(e) To invest in a plant and equipment, and to keep up said plant ... and to increase such investment in said business as the demand for Coca–Cola in bottles in said territory may require.

(f) To allow party of the first part, or its representatives, to enter upon and examine the premises where said Coca–Cola is bottled and prepared for market....

....

(h) To order, for the purpose of bottling Coca–Cola, the distinctive bottle....

....

....

SIXTH: Failure of party of the second part to properly and vigorously push the sale of bottled Coca–Cola shall be deemed a violation of this contract, and party of the first part shall have the option to terminate same....

Dkt. 396A, exh. 5 (Elizabethtown's Bottle Contract).

As the above excerpt demonstrates, the syrup covered by the contract is not defined, and is variously described as "syrup for bottling purposes," "bottlers' Coca–Cola syrup," "Coca–Cola syrup," and "Bottler's Coca–Cola in syrup form." The Court has held previously in the Coke case, however, that paragraph 10 of the Consent Decrees informs the question of the breadth of the coverage of the contracts. *See Coke II*, 98 F.R.D. at 267. Indeed, in the preliminary injunction context, the Court found that the syrup described in the decrees could not be different from that covered by the bottlers' individual contracts. *Coke V*, 668 F.Supp. at 916 ("The 'syrup' first-line bottlers receive cannot be different from that which the Company bound itself to deliver under the Consent Decrees.").

Paragraph 10 of the Consent Decrees, an oft-quoted clause in this litigation, provides that "the syrup sold and furnished by [the Company] to the [parent bottler] is to be high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup." Dkt. 396A, exh. 4, at 6 (Whitehead–Lupton Consent Decree). The import of paragraph 10 is contested by the parties. The Company contends that the paragraph's provisions plainly exclude diet Coke, which is, according to the Company, not "high grade standard Bottlers Coca–Cola Syrup," and which certainly does not contain 5.32 pounds of sugar.[27] The plaintiffs counter that the purpose of paragraph 10 is not to define the coverage of the contract as limited to a single version of Coca–Cola Bottler's Syrup but to protect the bottlers by preventing the Company from circumventing the pricing formula by diluting syrup quality.

Moreover, as the plaintiffs point out, the Court rejected the idea that 5.32 pounds of sugar defined Coca–Cola Bottler's Syrup in *Diet Coke III.* 107 F.R.D. at 296. And,

**27.** This argument has a lot of initial appeal. *See Diet Coke I,* 563 F.Supp. at 1135 ("While the phrase 'standard Bottlers Coca–Cola Syrup' is ... undefined in the corpus of the 1921 Consent Decrees, it seems clear that the syrup must contain 5.32 pounds of sugar. Since diet Coke syrup contains absolutely no sugar, *a fortiori,* it is not likely to be encompassed by the contractual phrase Bottler's Coca–Cola Syrup as employed by the 1921 Consent Decree.").

perhaps most compellingly, acceptance of the Company's argument leads relentlessly to the conclusion that new Coke sweetened with HFCS cannot be Coca–Cola Bottler's Syrup, a conclusion the Company rejects.

The Company attempts to reconcile this inconsistency by maintaining that HFCS is a type of sugar, and that an essential characteristic of Coca–Cola Bottler's Syrup is that it is and always has been highly caloric. The Court sees at least one problem with the Company's attempted reconciliation.

For the purposes of this litigation, HFCS is not sugar as that term is employed in the relevant agreements. The parties no more contemplated a syrup containing fructose than one containing aspartame. In fact, the recent history of the bottlers prior to the entry of the decrees suggests that the last thing they would have agreed to was the use by the Company of a sweetener made from corn syrup. The use of corn sweeteners during World War I displeased the bottlers because of the effect on the quality of the product. Now that technological developments make possible the use of a sweetener derived from corn syrup, it is not unreasonable in the setting of a perpetual contract to account for the evolution within the contract. If such flexibility is employed with respect to HFCS, however, it seems logical to apply it to aspartame.

█ Finding the bottlers' proffered explanation of the coverage of the phrase Coca–Cola Bottler's Syrup inadequate to support entry of summary judgment and finding similarly significant flaws in the defendant's position, summary judgment on both sides' motions will be denied.

## V. THE AMENDED BOTTLERS CROSS–MOTION

The amended bottlers have cross-moved separately for summary judgment asking that the Court declare:

(1) that the syrup for diet Coke that was made when "the formula for Bottle Syrup [was] modified to replace sugar ... with another sweetening ingredient ..." and is, therefore, covered under the 1978 Amendment;

(2) that The Coca–Cola Company is obligated to pass on to the amended bottlers any savings that have resulted from the use of a sweetening ingredient in the Bottle Syrup for diet Coke that is cheaper than the "Sugar Element" computed under the 1978 Amendment;

(3) that The Coca–Cola Company is obligated to pay the plaintiffs as damages the amount by which defendant has overcharged the amended bottlers for diet Coke syrup since 1982 in breach of the 1978 Amendment, as shown by the Charts [submitted by the plaintiffs], plus interest on the overcharges; and

(4) that the amended bottlers are not barred by the Temporary Amendment (¶ 9) from recovering damages from The Coca–Cola Company based on The Coca–Cola Company's breach of its obligations to supply plaintiffs' requirements of diet Coke syrup under the 1978 Amendment.

Dkt. 269, at 6–7.

This motion potentially presents three issues.[28] The Court finds it necessary to address only one.

Paragraph 1(c) of the 1978 Amendment provides:

In the event the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient. The Sugar Element would continue to

**28.** These issues are: (1) whether diet Coke is Bottle Syrup under the 1978 Amendment; (2) if so, whether saccharin and/or aspartame fall within the term "another sweetening ingredient" under that amendment; and (3) assuming issues (1) and (2) are answered affirmatively, whether the Temporary Amendment constitutes an irrevocable waiver of damages for the overcharges for diet Coke.

fluctuate in the manner described above for sugar.

Dkt. 269A, exh. A (1978 Amendment).

The issue the Court must determine is whether the evidence already in the case relating to the question of the definition of Bottle Syrup is undisputed.[29] The plaintiffs argue that the logical application of the facts established in the preclusion order renders inevitable the conclusion that diet Coke is Bottle Syrup within the meaning of the 1978 Amendment. The Company defends by claiming that the preclusion order did not establish that diet Coke is Coca–Cola Bottler's Syrup and therefore the plaintiffs overreach. The Company also argues that the 1978 Amendment was not intended to change the scope of coverage of the contracts.

Regardless of the definition of Coca–Cola syrup selected, however, the outcome on this issue may be the same. The Company concedes that the syrup for Coca–Cola Classic is "Bottle Syrup" under the 1978 Amendment. The preclusion order establishes that diet Coke's ingredients match those of Coca–Cola Classic syrup with the exception of the different sweetener. *See Diet Coke IV*, 110 F.R.D. at 376 (¶ 2(n)(2)):

> (n) except for the different sweeteners, the bottle syrup sold by defendant to the bottlers ... for the production of bottled diet Coke contains precisely the same ingredients, in identity, number, and quantity, as the bottle syrup sold by defendant to the bottlers ... for the production of:
>
> .    .    .    .    .
>
> (2) Coca–Cola Classic; ...

Ingredient similarities do not end the matter, however. If the Company proves that the term "Bottle Syrup" was meant to be limited to the single product carrying the trademark in 1978, then the facts established by the preclusion order would not aid the plaintiffs. However, the Company now offers the bottlers a variety of "Coca–Colas" under the 1978 Amendment. Given

the provisions for future products, coupled with the number of products now offered, the Company must explain how the language may be read to restrict the term "Bottle Syrup" to the version of Coca–Cola then produced.

Due to these factual disputes, the amended plaintiffs' motion for summary judgment will be denied.

## VI.  THE TRADEMARK CLAIMS

The defendant also has moved for summary judgment seeking dismissal of Counts Three and Four of the unamended plaintiffs' complaint, and Counts Four and Five of the amended plaintiffs' complaint,[30]

> on the grounds that the plaintiffs do not have vested ownership interests in the trademarks "Coca–Cola" and "Coke" and, therefore, plaintiffs are not entitled to relief either on (i) their claim that the Company infringed and damaged "their long-established goodwill and vested rights in and to the 'Coca–Cola' and 'Coke' trademarks and trade names' [Count 3 in 83–95 and Count 4 in 83–120], or (ii) their claim that the Company "has diluted the value of plaintiffs' rights in and to the 'diet Coca–Cola' and 'diet Coke' trademarks and trade names" [Count 4 in 83–95 and Count 5 in 83–120].

Dkt. 403 (83–95); Dkt. 265 (83–120).

The plaintiffs in both cases have cross-moved for summary judgment on their trademark and antidilution claims.

The original contract between the Company and Whitehead and Thomas was amended in 1915. That amendment specifically treats the Company's grant of trademark rights to the parents:

> For and in consideration of the agreement to sell and agreement to purchase, [the Company] does hereby give and convey to [the parent bottlers] the right to use the trademark name Coca–Cola, and all labels and designs pertaining thereto, in connection with the product bottled

---

**29.** As the Court has noted earlier, *see Diet Coke I*, 637 F.Supp. at 1228, the term is ambiguous and thus extrinsic evidence may be considered.

**30.** The trademark rights of the two groups of bottlers are coextensive. *See Diet Coke I*, 563 F.Supp. at 1139.

Coca–Cola, in the territory heretobefore obtained by [the parent bottlers] and agrees not to convey, assign, or transfer the right of usage of said name in said territory, to any other party whatsoever; and [the Company] further agrees to only manufacture syrup for bottling purposes in sufficient quantities to meet the requirements of [the parent bottlers], and of Coca–Cola Bottling Company, and for the requirements of the territory not conveyed.... Nothing herein, however, shall give to [the parent bottlers] any interest in the name Coca–Cola, labels, etc., except the right of usage in connection with bottled Coca–Cola, nor shall this contract in any way interfere with the use of said name Coca–Cola, labels, etc., in connection with the fountain product of [the Company] it being understood and agreed that the use herewith given shall be confined to the bottled product, the name, labels, etc., in connection with the fountain product to be used as [the Company] deems fit and advisable, in any and all territory. [The Company] does hereby select [the parent bottlers] as its sole and exclusive customer and licensee for the purposes of bottling Coca–Cola in the territory heretofore acquired by said [parent bottlers], and [the Company] agrees not to sell its fountain syrup to any one when [the Company] knows that said syrup is to be used for bottling purposes.

*Coke 1920*, 269 F. at 802 (quoting 1915 amendment). The 1915 amendment of the contract between the Company and the parents necessitated corresponding amendments to the first-line bottlers' contracts. The corresponding amendments closely followed the language of the 1915 amendment:

FIRST: That [the parent] hereby gives and conveys to [the first-line bottler] the right that it received from THE COCA–COLA COMPANY, to use the trade-mark name COCA–COLA, and all labels and designs pertaining thereto, in connection with the product "Bottled Coca–Cola" in the territory heretofore obtained ...; and [the parent] agrees not to convey, assign or transfer the right of usage of said name in said territory to any other party whatsoever; and [the parent] agrees to obtain and furnish to [the first-line bottler], and only to obtain, for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of [the bottler] in the territory now owned or controlled by [the bottler], provided [the parent] can obtain such syrup from The Coca–Cola Company. *Nothing herein, however,* shall give [the bottler] any interest in the name COCA–COLA, ..., except the right of usage in connection with Bottled Coca–Cola, nor shall this contract in any way interfere with the use of said name COCA–COLA, ... in connection with the fountain product of THE COCA–COLA COMPANY, *it being understood and agreed* that the use herewith given shall be confined to the bottled product; the names, labels, etc. in connection with fountain product having been reserved by THE COCA–COLA COMPANY.

Dkt. 63, exh. G (Whitehead–Lupton first-line bottler's contract) (emphasis in original). The Thomas Co. first-line bottler's contract is virtually identical, but for the initial language of conveyance. While the Whitehead–Lupton contract uses the words "gives and conveys," the Thomas Co. contract employs the word "assigns." *See* Dkt. 63, exh. H (Thomas Co. first-line bottler's contract).

Judge Morris's 1920 opinion addressing the Company's motion to dismiss and the parent bottlers' preliminary injunction motion examined the disputed trademark rights of the parents in some detail. One of the grounds for the Company's motion was that the parents had assigned all of their rights in the trademark to the first-line bottlers and had no trademark-based rights left to assert. Judge Morris's trademark analysis was central to his holding that the contracts asserted by the Company to be terminable-at-will were in fact perpetual.

The starting point for Judge Morris's study of the nature of the disputed contract, after a review of the applicable rules of construction, was the recognition of the

Company as the original owner of the secret process for making Coca–Cola, of the trade-name and trademark, and of the good will associated with the product. *Coke 1920*, 269 F. at 805. That good will, according to Judge Morris, could be "bought and sold in connection with a business as an incident thereof." *Id.* The trademark, however, could not be separated from the good will. *Id.* at 806. "In fact," Judge Morris noted, "a trade-mark is merely one of the visible mediums by which the good will is identified, bought, and sold, and known to the public." *Id.* This connection between a mark and the "business or merchandise with which it has become established," was essential in order for the mark to retain its character as property. *Id.*

Next Judge Morris reviewed the Company's original rights in the bottling business, concluding that the Company, while "not then actually engaged in bottling the drink, was the sole owner of all the rights essential to the bottling and sale thereof as Coca–Cola." *Id.* From this conclusion, the judge reasoned, "it seems clear that at the time of the execution of the contract the business of bottling the Coca–Cola and selling it when bottled had a potential existence, that all rights in the potential bottling business were owned by the [Company], and that such business, though potential, and not actual, could be sold" *Id.*

The plaintiff parent bottlers' trademark rights were relevant to the questions before Judge Morris because of the Company's position that the contracts were nothing more than agreements for the sale and purchase of syrup, and the plaintiffs' contrasting position that "the agreement granted and conveyed or assigned to it the sole and exclusive right to use in its territory the trade-mark and trade-name upon bottled Coca–Cola; that this was a transfer of property or property rights to which the covenant of [the Company] to manufacture for and to sell to the [parent bottlers] Coca–Cola syrup was ancillary and incidental; and that therefore the contract is not at will but of perpetual duration." *Id.* at 807.

What was the paramount purpose of the contract ...? In my opinion it was the establishment of the business of bottling the Coca–Cola drink by Whitehead and Thomas. As I understand the contract, the rights in good will and trade-mark name acquired under the contract by the bottlers were the same in character and as permanent as if [the Company] had sold to them an established bottling business with its trademarks and good will. A contract merely for the purchase and sale of syrup would not be a repository for covenants making obligatory on the part of the purchaser the establishment of bottling plants ...; nor would it be a repository for a grant of the sole and exclusive right to use the trade-mark of the vendor ... upon the product of those bottling plants.

... A contract so constituted shows an essential object and purpose immeasurably broader than the mere purchase and sale of syrup.... Th[e] result is the sale and purchase of a potential business and the establishment of an actual business.... In the transaction property rights passed from the Georgia corporation to the bottlers....

*Id.* at 808. Judge Morris's finding that the contracts evidenced more than "the mere purchase and sale of syrup" was grounded in the effect of the combination of covenants present in the contracts. Chief among these covenants was the transfer of the trademark and tradename. That transfer, in Judge Morris's view, "conferred upon the bottlers the right to acquire the syrup and it transferred to them an interest in its good will and trade-mark and trade-name." *Id.* at 810.

The extent of that interest, which is the question before this Court presently, was less than "a transfer in gross." *Id.* Yet, there was no need in 1920 to determine "whether the interest in the trade-mark acquired by the bottlers was a legal title or merely a beneficial interest." It was necessary to decide whether the interest was limited or unlimited, however.

Taking all the circumstances of the contracts into account, the court determined that "in the absence of words of limitation, and in the light of the fact that the essen-

tial object and purpose of the contract was the building up of the bottling business ..., I am unable to find any sound principle upon which to base a conclusion that the right so conveyed was other than an absolute and unlimited right of user in the complainant to the exclusion of all others, including [the Company]...." Judge Morris then quoted *Kidd v. Johnson*, 100 U.S. (10 Otto) 617, 619, 25 L.Ed. 769 (1880), which states that "[i]f the owner [of a trade-mark] imposes no limitation of ... time [upon the right to use the trade-mark], the right to use is deemed ... perpetual."

Thus, one of the bases for Judge Morris's finding that the contracts between the parents and the Company were perpetual was the unlimited nature of the "right of user" of the parents. Just exactly what sort of "unlimited" interest this gave the parents is one question which must now be examined. Even supposing that the interest of the parents was a type of ownership interest, however, the derivative rights of the actual bottlers must be proven.

The Court now directs its attention to the Consent Decrees, which contain provisions that may alter the analysis. Paragraph 8 of the decrees states that any rights of the parents in the trademark would revert to the Company. Specifically, it reads:

Whatever title, right or ownership, if any, [the parent bottler] may have heretofore acquired, either under existing contracts ... or by virtue of its using and vending thereof in the trademark ... as to bottled Coca–Cola, said [parent bottler] does hereby transfer and assign to [the Company]; but it is agreed that [the Company] hereby grants to [the parent bottler], the sole and exclusive right and license to use and vend on bottled Coca–Cola the trade-mark, trade-name Coca–Cola and other Coca–Cola labels and designs, and to use the patented ... Coca–Cola bottles ... subject only to forfeiture in any territory that may be forfeited under the provision of the contract as amended; coupled with an interest in said right to use and vend, which right and license is perpetual and irrevocable either by The Coca–Cola Company or its successors and assigns, ...; and neither

said The Coca–Cola Company nor its successors, assigns, receivers, or trustees ... shall have the right to use or vend said trade-mark, trade-name, labels, designs, and patented designed bottles on or in connection with bottled Coca–Cola within such territory,....

Dkt. 1 (83–95) exh. S.

Paragraph 9 of the Consent Decrees also plays a part in the definition of the plaintiffs' trademark rights. That paragraph clarifies the Company's "right to prosecute and defend all suits about the trademark, trade-name, labels, designs patented designed bottles and litigation desirable for the protection thereof." *Id.* Paragraph 9 also bestows on the Company the bottlers' permission to use their names in any such litigation, "wherever the question arising may be in the territory that makes it proper to use [their names]."

After the entry of the decrees, the first-line bottlers' contracts were conformed to the amendments agreed upon in the decrees. In so doing, the contracts repeated the exact trademark language analyzed by Judge Morris in his preliminary injunction opinion. "As the plaintiffs correctly note, ... no prudent contract draftsman would utilize the same language if a different meaning were intended." *Diet Coke I*, 563 F.Supp. at 1138.

This Court in *Diet Coke I*, after having reviewed the above, decided that there was no need to "determine the correctness of the plaintiffs' position." *Id.*

Instead, the Court need only look to the maximum aggregate of rights that the plaintiffs may possess. Viewed in this light, the plaintiffs possess the sole and exclusive right to use the trademark, trade name and bottle in their exclusive territories. This right has not been abrogated by the Company.

*Id.* The question now before the Court is whether to adhere to this preliminary judgment, or whether a fuller consideration leads to a different conclusion.

The Company's main support for its motion on the trademark claims is that it is assertedly the "exclusive owner of the

trademarks," while the plaintiffs only enjoy a "limited right to use" them. Dkt. 272 (83–120) at 15. As a starting matter, although unsure of the difference the distinction makes, the Court notes that the Company's position as to the "limited" nature of plaintiffs' rights was rejected by Judge Morris. *See Coke 1920*, 269 F. at 810–11.

The plaintiffs counter that the term "right to use" during the period of the drafting of the 1915 amendments, Judge Morris's opinion, and the Consent Decrees, means more than that term implies today. According to plaintiffs, the Company's "paper title (i.e., registration)" does not affect their arguments. They also contend that their interest in the marks generates certain rights under the contracts; specifically, the right to all soft drink products manufactured by the Company using the mark at the pricing structure established by the decrees.

To the extent that the Company's position is that the plaintiffs have no "interest" in the trademark whatsoever, beyond a limited right of use, this Court is persuaded that the Company is incorrect. However, the rights flowing from the plaintiffs' interest, whatever it might be, may quite possibly be less extensive than the plaintiffs claim.

The proposition that the plaintiffs have an interest in the trademark is plain from the language of the transfer from the Company: "[the Company] hereby grants to [the parent bottler], the sole and exclusive right and license to use and vend on bottled Coca–Cola the trade-mark, [and] trade-name Coca–Cola." The Company's position that the plaintiffs are mere licensees, which finds support in the terms "license," and "right to use," fails to adequately address the recognition of the transfers as "partial assignments,"[31] or the peculiarities of trademark law as it stood at the time of the decrees and contracts.

At that time, the transfer by assignment of an interest in a trademark had to be in conjunction with the transfer of the good will of the business represented by the mark. Significantly, the Company's counsel participating in the settlement negotiations, Edward S. Rogers, was, according to the plaintiffs, "the most distinguished trademark scholar of the day." Dkt. 420 (83–95) at 53. If the Company had intended the 1921 agreements to effect a reassignment, it would surely have had the benefit of Mr. Roger's advice concerning the validity of such an assignment:

> Trade-marks can be assigned as an incident to the transfer of a business, but such matters ought to be carefully attended to, both legally and actually. A trade-mark may be transferred, but only in connection with the thing that it stands for, namely, the business it represents. [A] trade-mark without a business cannot be assigned and such attempted assignments are useless and legally are void. As well try to part a man from his shadow as to separate a trade-mark from the business from which legally it is inseparable.

E. Rogers, *Good Will Trade–Marks and Unfair Competition*, 101 (1914).

Additionally, the plaintiffs' reliance on cases such as *American Crayon Co. v. Prang Co.*, 28 F.2d 515, 516 (D.Del.1928), *vacated on other grounds*, 38 F.2d 448 (3d Cir.1930) (where parties competing for ownership each claimed "right to use") appears persuasive to the Court. Furthermore, the cases are replete with descriptions of ownership of a mark as flowing from the right to use it. *See, e.g., Weiner*

---

**31.** *See* 1 J. McCarthy, *Trademark and Unfair Competition*, § 18:1 [F], at 795 (2d ed. 1984) ("[A]n assignor with an established business can transfer rights to his business and, in addition, transfer *related rights in a potential business*. For example, a manufacturer of cola syrup, who never was in the bottling business, can transfer rights to both the manufacturing and the bottling business, since the potential bottling business is salable"); Halliday, *Assignments Under The Lanham Act*, 38 Trademark Rep. 970, 975 (1948) (the 1920 decision recognized "partial assignments"); 1 H. Nims, *The Law of Unfair Competition and Trade–Marks* 87 at n. 63 (4th ed. 1947) ("In *Coca–Cola Bottling Company v. The Coca–Cola Company*, defendant manufacturer of the syrup which was bottled by plaintiff, assigned to plaintiff its trade-mark for use on the bottled product"); W. Shoemaker, *Trade–Marks* 535 (1931) (company's transfer of good will and an interest constituted an assignment).

*King, Inc. v. The Weiner King Corp.*, 615 F.2d 512, 521 n. 5 (C.C.P.A.1980); *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319 & n. 6 (C.C.P.A.1976) ("That the right *to use* a trademark ... is independent of the Trademark Act is evident from a number of considerations.") (emphasis original). *Holiday Inn*'s explanation of the operation of section 7(b) of the Lanham Act [32] is pertinent here"

> Section 7(b) does not grant a positive *right to use* the registered mark; the Trademark Act does not give to the federal government power to grant positive rights to *use* marks and § 7(b) should not be so read. Under § 7(b), a certificate of registration is no more than prima facie *evidence*, and evidence only of an *exclusive* right, which right (as in the case of patents) means a right to *exclude others*, not a positive right to use.

*Id.* at 319. In any event, the sensible proposition that the sole, exclusive, and perpetual right to use the trademark "constitutes the only property right in it," [33] convinces the Court that the parties bargained for more than the issuance of a license.

Against the plaintiffs' claims, the Company sets its status as the registrant of the mark, the weight of the ownership factors set out in *General Business Services, Inc. v. Rouse*, 495 F.Supp. 526 (E.D.Pa.1980), and the asserted invalidity of plaintiffs' "joint ownership" theory. Taking these three objections in turn, the Court finds them unavailing.

First, the Company alleges that its undisputed status as the sole registrant of the "Coca–Cola," "Coke," and various other related marks and logos, coupled with the incontestable status of the *registration*, makes its ownership of them "incontestable." Section 33(b) of the Lanham Act provides that if a mark "has become incontestable under [15 U.S.C. § 1065], the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark." 15 U.S.C. § 1115(b) (1982). The Company argues that because it has

complied with section 1065's requirements, there can be no dispute concerning the ownership of the trademarks. *See, e.g., Consolidated Freightways, Inc. v. Central Transport, Inc.*, 201 U.S.P.Q. 524, 527, 530 (E.D.Mich.1978) (incontestable registration confers "conclusive proof of the ownership of the marks"); *Thrifty Rent–A–Car System, Inc. v. Thrift Cars, Inc.*, 639 F.Supp. 750, 754–55 (D.Mass.1986) (incontestable registration similar to quieting title), *aff'd* 831 F.2d 1177 (1st Cir.1987). However, a closer look at section 1065 betrays the weakness in the Company's reasoning. That section provides that certain marks "shall be incontestable," subject to several exceptions. [T]o the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter," the ownership of the mark is contestable. 15 U.S.C. § 1065 (1982). In the Court's view, this exception operates here.

Second, the Court does not find *General Business Services* conclusive on the question of ownership in this particular context. In fact, *General Business Services* recognizes the paramount evidence of ownership in the realm of trademark: the right to exclude others from use of the mark. *See General Business Services*, 495 F.Supp. at 533 ("ownership" follows from "quintessential right of exclusiveness"). Further, as is true of the authorities relied upon by the defendant in its "incontestable" registration argument, the parties competing in *General Business Services* had no explicit agreement concerning joint use of the marks.

Third, the defendant's contention that joint ownership is frowned upon in trademark law is of no moment. The defendant goes too far in contending that joint ownership of the "Coca–Cola" mark "is unworkable and fundamentally inconsistent with basic principles of trademark law." Dkt.

---

**32.** 15 U.S.C. § 1057(b) (1982).

**33.** PX 580 (81–48) (letter to Sizer from Sibley concerning the negotiations between the Company and the parents).

424 (83–95) at 33. In the Court's view, in the case of Coke products, rather than creating a likelihood of confusion in minds of the public as to source, joint ownership better represents reality.[34] The bottlers and the Company share responsibility for the quality of the product.[35] Moreover, the bottlers own the bottling business, "a separate and distinct part of the business"[36] of producing Coca–Cola.

Notwithstanding the above, the Company contends that it is entitled to summary judgment on the plaintiffs' claims because, even if they received "ownership" rights through the parent bottlers, these rights were "reassigned" in the Consent Decrees. As noted above, the Consent Decrees contain several provisions relating to the question of the parent bottlers' trademark rights. Paragraph 8 of the decrees forms part of the basis for the Company's contention that whatever ownership rights the parent bottlers had prior to 1921 were abrogated by the decrees. Paragraph 8 transfers "[w]hatever title, right or ownership, if any, [the parent bottler] may have heretofore acquired . . . in the trade-mark, trade-name, labels, designs, and patented designed bottles" to the Company. In exchange, the Company granted to the parent bottler "the sole and exclusive right and license to use and vend" the trademark "on bottled Coca–Cola." The Company emphasizes that the language of reconveyance did not refer to "title, right or ownership," but rather the "right and license to use" the marks. This explanation fails to account for the further language of paragraph 8, granting the bottlers "an interest in said right to use and vend," nor does it account for the perpetual nature of the rights created. Again, a perpetual, sole, and exclu-

sive license to use a trademark is a right with a good many of the indicia of ownership.

Furthermore, the correspondence among the parties at the time of the decrees reflects the reason for the language in paragraph 8: to protect the Company *and* the bottlers through eliminating uncertainties as to "legal title" for the purpose of infringement actions.[37]

■] The final issues raised by the trademark summary judgment motions concern the substantive rights of the bottlers in light of the foregoing discussion. The bottlers contend that their ownership rights in the marks on bottled products in turn generate rights to "share equitably in any legitimate leveraging (or "line extension") of the marks that transfers any of the good will of Coca–Cola to new products and, therefore, a right to receive diet Coke under the formula pricing terms of the same perpetual contracts that confirmed their ownership." Dkt. 420 (83–95) at 56–57. In the alternative, should the Court deny their request for "the diet version of Coca–Cola," *id.* at 57, the plaintiffs request "a declaration that the Bottlers have a right to produce or obtain from other sources their own diet syrups and to sell them in their territories as diet Coke." *Id.*

In support of their first request, the plaintiffs refer the Court to *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (1933). *Kirke La Shelle* involved a plaintiff that owned one-half of the profits from a play seeking a share of the proceeds from the rights to the film. Talking motion pictures were unknown at the time of execution of the

---

**34.** The Company's assertion that only dual ownership, i.e., ownership by independent parties, is cognizable under trademark law is faulty. Section 2(d) of the Lanham Act (15 U.S.C. § 1052(d)) allows for concurrent registration, and thus sanctions joint ownership. The restrictions in that section, preventing concurrent registration where confusion, deception or mistake is likely, do not apply here, where the uses of the marks by the Company and by the bottlers differ "as to the mode or place of use . . . or the goods in connection with which such marks are used." *Id.*

**35.** Each contests the quality control responsibility exercised by the other. It appears to the Court that the Company exercises some quality control, but that the bottlers' quality control responsibilities are also significant.

**36.** 1 J. McCarthy, Trademarks and Unfair Competition, § 18.12, at 826 (2d ed. 1984).

**37.** *See, e.g.,* PX 615 (81–48) (settlement memorandum of June, 1921); PX 580 (81–48) (letter from Sibley to Sizer dated Mar. 2, 1921).

contract. Nevertheless, the court held that the plaintiff was entitled to a portion of the proceeds from the film, because

> having granted to appellant one-half of the benefits of the production of the play in the manner specified in the contract, there was an implied obligation on the part of respondents not to render valueless the right conferred by the contract, especially in view of the fact that they breached the express covenant of the contract to refrain from making any agreement affecting the rights conveyed to appellant without its approval.

*Id.*, 263 N.Y. at 90, 188 N.E. at 168.

Two factors distinguish *Kirke La Shelle* from the case at bar. The former contract contained an express term breached by the defendants-appellants; the latter contracts contain no such express term. Secondly, *Kirke La Shelle*'s holding turns on the finding that the defendants-appellants had breached an implied duty of good faith. The evidence of any such breach on the part of the Company is mixed, at best. Most importantly, decisions like *Kirke La Shelle,* whatever their effect when applied to the present case, only reinforce the Court's conviction that the plaintiffs' trademark claims are integral to their contract claims. That is, the plaintiffs' interest in the mark will be a significant element in the final resolution of their contract claims, but their rights under the mark must be evaluated in light of their contracts rather than by applying the Lanham Act.

The plaintiffs anti-dilution claims are also misguided. In their complaint, they allege that the defendant's "position that it can use the marks on soft drink variants outside its agreements with plaintiffs and other bottlers substantially undermines the value of those agreements, and of plaintiffs' vested interests in the product and the marks and trade names." Dkt. 1 (83–95) at 30. This claim is ill-founded. The plaintiffs have pointed to no evidence that the "Coke" or "Coca–Cola" marks are diluted by the defendant's leveraging. Additionally, the plaintiffs have not, to the Court's knowledge, specified the statutory bases for the causes of action under which they are proceeding on this Count. The latter failing without more is, at this stage of the protracted litigation between the parties, fatal to the plaintiffs' maintenance of their anti-dilution claims.

The death knell to plaintiffs' anti-dilution theories is the absence of a persuasive explanation based on the evidence of why the plaintiffs are seeking diet Coke at a lower price if the effect of the defendant's line extension is to dilute the value of the mark. As the defendant correctly points out, this argument makes little if any economic sense, and therefore, summary judgment is all the more warranted. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

There are similar defects in the substantive rights putatively following from the plaintiffs' rights in the trademark. Despite finding that the plaintiffs enjoy rights broader than those of licensees, the Court is unconvinced that the plaintiffs trademark claims under section 43(a) of the Lanham Act, 15 U.S.C. § 1125, have any force. The plaintiffs cite "three different types of conduct" from which section 43(a) is designed to protect trademark owners: (1) "palming off"; (2) "confusion of sponsorship"; and (3) "reverse confusion of sponsorship." Dkt. 427 (83–95) at 18–19. Not one of these three situations fits the facts before this Court. All three situations require a showing by the plaintiff of a likelihood of confusion. *See Schering Corp. v. Schering Aktiengesellschaft,* 667 F.Supp. 175, 187 (D.N.J.1987). No such likelihood exists here. The Company is not, by its line extensions, "palming off" diet Coke as someone else's product. There is no more "confusion of sponsorship" of diet Coke than there is of Coke. Any "confusion" occurs solely because of the unusual nature of the relationship between the bottlers and the Company: this is not actionable. Accordingly, the plaintiffs' trademark claims, insofar as they are based on section 43(a) of the Lanham Act, as well as their anti-dilution claims, fail in essential respects.

Summary judgment in defendant's favor will be granted on Counts Three and Four of C.A. No. 83–95 and Counts Four and Five of C.A. No. 83–120, subject to the limitations set forth earlier in this section concerning the plaintiffs' interests in the trademarks.

## VII. THE ANTITRUST CLAIMS

■ Before beginning the analysis of the plaintiffs' antitrust claims, recollecting the summary judgment lesson of *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is helpful. *Matsushita* comments that "[t]here is little reason to be concerned that by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage such conspiracies." *Id.* at 595, 106 S.Ct. at 1360. Stating the summary judgment standard in the antitrust setting, the *Matsushita* Court emphasized that nonmovants "must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury." *Id.* at 585–86, 106 S.Ct. at 1355–56.

Plaintiffs' theories are two: (1) they contend that the Company violated Section 2 of the Sherman Act,[38] by misusing its alleged monopoly power over Coca–Cola syrup in an attempt to monopolize at the bottler level; (2) the Company has directly attempted and conspired to monopolize the plaintiffs' Coca–Cola bottling businesses in violation of Sections 1 and 2 of the Sherman Act.[39]

Section 1 of the Sherman Act forbids any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. Thus, establishing a violation of section 1 essentially requires proof of a conspiracy. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Section 2 prohibits monopolization

and "attempt[s] to monopolize," and thus reaches unilateral action. 15 U.S.C. § 2.

Under both their theories, the plaintiffs must first plead and prove the relevant product markets and geographic markets. *See, e.g., Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 148 n. 13 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982) (required element of either section 1 or section 2 violation—with the exception of per se restraints—is proof of "relevant product market"); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 26–27 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). The inquiry under the two sections, however, differs. "The § 2 definition looks to the existence of competitors as evidence of countervailing power which would preclude monopolization. § 1, in contrast, is concerned with patterns of competition as a means of judging whether a restraint of trade is unreasonable." *Columbia Metal,* 579 F.2d at 27 n. 11.

The plaintiffs have pleaded two product markets: (1) the market for Coca–Cola syrup; and (2) each bottler's bottling business. The defendant asserts that "[a] single manufacturer's trademarked product cannot constitute a relevant product market where plaintiffs' own allegations show that there is vigorous competition from substitute products of other manufacturers." Dkt. 410, at 25. In support of this contention, the Company cites *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117–18 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). If this contention proves meritorious, the plaintiffs' antitrust claims will fail.

There is a wealth of case law guiding the determination of relevant product markets. *See, e.g. Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953). The governing standard for drawing mar-

---

**38.** 15 U.S.C. § 2 (1982).

**39.** 15 U.S.C. §§ 1 and 2 (1982).

ket boundaries is stated in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956): "Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another." The shorthand of this standard, "reasonable interchangeability," *see American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.1984), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1985), leads courts to probe the demand cross-elasticity of products which could be substitutes. *See Pennsylvania Dental Ass'n v. Medical Service Ass'n*, 745 F.2d 248, 260 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). Put simply, to test the charge of the defendant that the plaintiffs cannot show the requisite market, the Court must discover whether reasonable substitutes for the pertinent product are available to buyers.

*Du Pont* contains a fitting example:

If a large number of buyers and sellers deal freely in a standardized product, such as salt or wheat, we have complete or pure competition. Patents, on the other hand, furnish the most familiar type of classic monopoly. As the producers of a standardized product bring about significant differentiations of quality, design, or packaging in the product that permit differences of *use*, competition becomes to a greater or less degree incomplete and the producer's power over price and competition greater over his article and its use, according to the differentiation he is able to create and maintain. A retail seller may have in one sense a monopoly on certain trade because of location, as an isolated country store or filling station, or because no one else

makes a product of just the quality or attractiveness of his product, as for example in cigarettes. Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or *soft-drink manufacturers* have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*Du Pont*, 351 U.S. at 392–93, 76 S.Ct. at 1005–06 (footnote omitted and emphasis added).

*Du Pont*'s application to the present case could not be plainer. There can be no serious dispute that Coca-Cola products are in competition with many other soft drinks. The relevant product market might more reasonably be drawn as national brand soft drinks or national brand diet colas, *see Beverage Management, Inc. v. Coca-Cola Bottling Corp.*, 653 F.Supp. 1144, 1148 (S.D.Ohio 1986), but such a market would not aid the plaintiffs' theories.

The defendant's citation of decisions in which single product markets were rejected is well taken.[40] The implausibility of plaintiffs' asserted relevant markets is glaring.

Both the putative market for Coca-Cola syrup and the market for a Coca-Cola bottling business in an exclusive territory strike the Court as meager. As the defendant points out, the plaintiffs have not contended that bottlers face no competition: rather, they have claimed that there is "vigorous interbrand and intrabrand competition at the bottler level on which plaintiffs compete." Dkt. 1 (83–95) at ¶ 61; Dkt. 1 (83–120) at ¶ 67.

---

**40.** *See, e.g., Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117–118 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) (product market not restricted to Texaco gasoline); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487–91 (5th Cir.1984) (Holiday Inn hotel rooms not pertinent market); *Parsons v. Ford Motor Co.*, 669 F.2d 308, 312 (5th Cir.), *cert. denied*,

459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982) (relevant market larger than "new Ford automobiles"); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F.Supp. 674, 679 (S.D.N.Y.1987) (no need for "protracted discovery" to find that "Rolex watches are reasonably interchangeable with other high quality timepieces."); *see also* authorities collected at Dkt. 410 (C.A. No. 83–95) at 28 n. 6.

The plaintiffs turn in vain to *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), and *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir.1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971), contending these cases show that there can be monopoly power over a single branded product. Both cases involved companies found to be monopolists in the *final product market;* i.e., the market for photographic supplies and the market for motion picture advertising accessories, respectively. The plaintiffs' attempt to confine Coca–Cola syrup to its own market is irrational.

The second product market theorized by the plaintiffs is the market for "the Coca–Cola bottling businesses of each of the plaintiffs." Dkt. 1 (83–95) ¶ 55. The plaintiffs postulate that the Company's refusal to supply diet Coke syrup to the plaintiffs "under the terms of their perpetual Coca–Cola bottler's contracts is a part of an overall plan on the part of The Coca–Cola Company to unlawfully exercise its monopoly power over Coca–Cola syrup and to 'restructure' and thereby expand its monopoly power to the independent Coca–Cola bottling businesses of the plaintiffs and other Coca–Cola bottlers." Dkt. 425 (83–95) at 1. The Company's purchase of individual bottlers and plan to restructure other bottlers' contracts cannot violate antitrust laws as an extension of the Company's monopoly power over Coca–Cola syrup unless the Company in fact has monopoly power over Coca–Cola syrup. The fact that the Coca–Cola Company is the only maker of Coca–Cola syrup does not make the Company a monopolist. To be a monopolist for the purposes of the antitrust laws, one must control a market.[41]

For the reasons given above, the defendant will be granted judgment on the plaintiffs' antitrust claims, as set forth in Count Five of 83–95 and Count Six of 83–120.

## VIII. CONCLUSION

Because of the remaining significant factual uncertainties regarding the definition of Coca–Cola Bottler's Syrup and the ramifications of that definition on the plaintiffs' contractual rights, the parties' cross-motions on those issues will be denied. For similar reasons, the amended plaintiffs' summary judgment motion will be denied. Subject to the limitations outlined in the trademark section, the defendant's motions for summary judgment on the plaintiffs' trademark, anti-dilution, and antitrust claims will be granted.

---

**41.** The plaintiffs assertions concerning the alleged factual questions surrounding whether Coca–Cola syrup is a sub-market of the sort countenanced in *Columbia Metal*, 579 F.2d at 27, are without substance. The Court does not accept the forced analogy proffered by the plaintiffs: Coca–Cola syrup is not distinguishable from other cola syrups or concentrates in the same manner that, to use an example of a sub-market cited in *Columbia Metal*, championship boxing matches are distinguishable from all other boxing matches.